**STATE of Minnesota, Respondent,**

v.

**Jerrell Michael BROWN, Appellant.**

**Nos. A10–0992, A11–1293.**

Supreme Court of Minnesota.

July 3, 2012.

---

Lori Swanson, Attorney General, St. Paul, MN, Michael O. Freeman, Hennepin County Attorney, Michael Richardson, Assistant County Attorney, for respondent.

David W. Merchant, Chief Appellate Public Defender, G. Tony Atwal, Assistant Public Defender, St. Paul, MN, for appellant.

## OPINION

PAGE, Justice.

In March 2010 Jerrell Michael Brown was convicted of aiding and abetting first-degree murder for the benefit of a gang in connection with the shooting death of Darius Ormond Miller, which occurred on August 29, 2008. On appeal, Brown challenges his conviction, claiming that the trial court violated his right to a public trial and erred in its evidentiary rulings and jury instructions. Brown also claims the prosecutor violated his right to a fair trial by failing to disclose impeachment evidence. Because the facts of this case do not implicate the right to a public trial, the trial court did not err in its evidentiary rulings or its jury instructions, and the undisclosed impeachment evidence was not material, we affirm Brown's conviction.

On August 29, 2008, Darius Miller was fatally shot outside a club in downtown Minneapolis. Following a police investigation, the State filed a criminal complaint alleging that Jerrell Brown aided and abetted the second-degree intentional murder of Miller. Minn.Stat. § 609.19, subd. 1(1) (2010); Minn.Stat. § 609.11 (2010); Minn.Stat. § 609.05, subd. 1 (2010). The State later presented the evidence against Brown to a grand jury. To link Brown to Miller's murder, the State provided the grand jury with forensic evidence that a .9mm bullet casing found near Miller's body matched a .9mm bullet casing recovered from the scene of a June 2008 reckless-discharge-of-a-firearm offense, which occurred in Richfield and to which Brown had previously pleaded guilty.[1] Using a transcript of Brown's guilty plea, the State established Brown's participation in the June 2008 Richfield shooting incident. The State provided the grand jury with additional evidence, including eyewitness testimony and surveillance camera footage. The grand jury indicted Brown on four

---

1. The facts of the reckless-discharge-of-a-firearm case are as follows. On June 23, 2008, Brown was driving a vehicle that was stopped at a stoplight in Richfield, Minnesota, when he was approached by several individuals and threatened. Brown then fired a handgun into the air and drove away. Brown was arrested July 1, 2008, subsequently pled guilty to recklessly discharging a firearm, and was released from jail on the afternoon of August 28, 2008, approximately 12 hours before Miller was killed.

counts of murder: (1) aiding and abetting first-degree murder, Minn.Stat. §§ 609.05, subd. 1, 609.185(a)(1) (2010); (2) aiding and abetting first-degree murder committed for the benefit of a gang, Minn.Stat. §§ 609.05, subd. 1, 609.185(a)(1), Minn. Stat. § 609.229, subd. 2 (2010); (3) aiding and abetting second-degree intentional murder, Minn.Stat. §§ 609.05, subd. 1, 609.19, subd. 1(1); and (4) aiding and abetting second-degree intentional murder committed for the benefit of a gang, Minn. Stat. §§ 609.05, subd. 1, 609.19, subd. 1(1), 609.229, subd. 2.

Brown filed a pretrial motion to dismiss the indictment, claiming the evidence of the June 2008 Richfield shooting incident "tainted" the grand jury because the evidence involved a previous bad act that did not fall within any of the exceptions to Minn. R. Evid. 404(b) ("Evidence of another crime, wrong, or act is not admissible to prove the character of a person in order to show action in conformity therewith."). Brown also filed a motion to exclude *Spreigl* evidence related to the Richfield shooting incident. In response to Brown's motion to exclude evidence related to the Richfield shooting incident, the State argued that the evidence was properly introduced at the grand jury proceedings for two reasons. First, the Richfield shooting was "inextricably intertwined" with Miller's murder. Second, the Richfield shooting evidence fell within an exception to Rule 404(b) because the evidence was offered to prove identity, opportunity, and lack of mistake or accident. The trial court denied Brown's motion to dismiss the indictment, explaining that the Richfield shooting evidence was

> appropriately introduced for the stated limited purpose of connecting [Brown] to

possession of one of the guns used at the scene of the homicide by way of forensic evidence that linked a shell casing found at the scene of the earlier crime to which the defendant pled guilty to unlawfully possessing a firearm to a shell casing found at the scene of the homicide being considered by the grand jury.

At a subsequent *Rasmussen* hearing, the trial court discussed the Richfield shooting evidence in the context of whether the evidence would be admissible at trial. The trial court ruled that the Richfield shooting evidence would be admissible at trial because the evidence was "so intertwined with the evidence that the State wants to present *and* is authorized to present under the evidentiary rules." (Emphasis added.)

At trial, the court allowed the State to introduce testimony that Brown and Miller were members of rival gangs. C.W. provided lay testimony about the gang to which Brown belonged: the Shotgun Crips. C.W. admitted that he was a former member of the Shotgun Crips and that, in exchange for his testimony in Brown's case, he received a reduced sentence in an unrelated case.[2] Sergeant Bart Hauge provided expert testimony that generally described Minneapolis gangs, including the Shotgun Crips; their participation in criminal activities; and some rituals and inner workings of gang memberships and hierarchies.

The State also introduced the following evidence. Less than 3 hours before Miller's murder, around 12:30 a.m. on August 29, 2008, Brown and four acquaintances, M.G., D.S., J.H., and T.S., were at a bar in downtown Minneapolis. Following an altercation, bar security personnel escorted

---

**2.** The reduced sentence was 20–months imprisonment stayed for 3 years, which reflected downward durational and dispositional departures from the presumptive 26–month executed sentence.

T.S. out of the bar. A bouncer from a nearby bar testified that two individuals subsequently identified as Brown and T.S. drove away in a colored Mercury Sable which was determined later to be registered to J.H.'s sister. The bouncer explained that he wrote down the license plate number of the vehicle because he believed it belonged to a customer. He also testified that he thought he saw a handgun.

At 3 a.m., witnesses saw M.G., D.S., and J.H. attack Miller in front of a club in downtown Minneapolis. A club security camera captured footage of the initial attack, but the fight soon moved off-camera. During the fight, someone yelled, "You better go get a gun." Eyewitnesses later heard several gunshots, followed by a pause, and then two close-range gunshots. The witnesses reported seeing an individual, who wore a white undershirt and a large necklace and had his hair in a ponytail, come up the club stairs just before the two close-range gunshots were fired. One witness testified that this same individual shot Miller. After shooting Miller, the individual ran back down the stairs and drove away in a dark-colored Mercury Sable or Ford Taurus. Much of the eyewitness testimony was corroborated by security camera footage from the club. One witness later identified Brown as the individual wearing the white undershirt and large necklace.

In addition to the eyewitness testimony, the State introduced testimony from two former jail mates to whom Brown had confessed committing the crime. Consistent with its pretrial rulings, the trial court allowed the State to introduce evidence that a bullet casing recovered as part of the police investigation of the Richfield shooting incident matched a casing found at the scene of Miller's murder. The State was also allowed to introduce evidence

that, following Brown's guilty plea in the Richfield shooting case, he remained in the Hennepin County jail until August 28, 2008. A jail security camera captured footage that showed Brown leaving the jail 12 hours before Miller's murder, with his hair in a ponytail and wearing a large necklace, white tank top, and dark pants. The State used that jail videotape to bolster the testimony of the witness who identified Brown as the person seen on the security camera footage from the club. Finally, the State was permitted to read portions of the transcript of a videotape of Brown pleading guilty to the Richfield shooting incident to provide context for the bullet casings and the jail videotape.

Brown argued at trial that the theory of the murder provided by the State was internally inconsistent. Brown's attorney cross-examined the State's witnesses, many of them extensively, focusing on inconsistencies between testimony given at the scene, the grand jury, and trial. Brown did not testify or call any witnesses in his defense.

Following closing arguments but before giving jury instructions, the trial court ordered that the courtroom door be locked for the duration of jury instructions. In explaining the situation, the judge stated on the record:

> For the benefit of those in the back. I am about to begin giving jury instructions. While that is going on the courtroom is going to be locked and people are not going to be allowed to go in and out.
>
> So, if anybody has to leave, now would be the time. You are welcome to s[t]ay. But I just want to make sure that everybody knows that the courtroom is going to be locked. We are all good? Deputy?

Once the courtroom door was locked, no spectators were let in or out during the

jury instructions, but no spectators who were in the courtroom at .the time jury instructions began were forced to leave. At the close of the instructions, the trial court handed out copies of the jury instructions and sent the jury to deliberate.

The jury found Brown guilty of all four counts of murder. After convicting Brown of aiding and abetting first-degree murder committed for the benefit of a gang, the trial court sentenced him to life imprisonment without possibility of release, plus an additional year of imprisonment based on the murder having been committed for the benefit of a gang.

Approximately 2 months after Brown's conviction and sentencing, the State disclosed at a post-trial hearing that the prosecutor failed to disclose an additional plea bargain between C.W. and another county attorney's office. Under the undisclosed plea bargain, C.W. agreed to "comply with all conditions of release in the Hennepin County matter, that he testify truthfully in the Hennepin County case at issue, if requested to do so by the state, and that he comply with all conditions of release in this matter as well." The trial court ruled that because it could not order a new trial (the deadline for filing a new trial having passed before the hearing), it did not have jurisdiction to conduct a post-trial *Brady* violation hearing and any such motion would need to be filed as a postconviction proceeding.

Brown then filed his direct appeal. After reviewing the trial court transcripts, Brown filed a motion with our court pursuant to *Sanchez–Diaz v. State*, 758 N.W.2d 843 (Minn.2008) (encouraging defendants to stay the appeal for remand on issues that require a factual record), seeking to stay his direct appeal and obtain a remand to the trial court for a *Brady* hearing and to clarify the record on the admissibility of certain evidence admitted at trial. We granted Brown's motion on December 23, 2010. Brown then filed a petition for postconviction relief with the district court.

In his petition for postconviction relief, Brown argued that: (1) the existing record contained no ruling by the trial court on the admissibility of the Richfield shooting incident; and (2) Brown was entitled to a new trial because the State's failure to disclose the additional plea bargain between C.W. and the other county attorney's office constituted a *Brady* violation. The postconviction court denied relief without holding an evidentiary hearing, affirming the trial court's ruling on the admissibility of the Richfield shooting incident and denying Brown's *Brady* claim for failure to meet the requirement that the evidence be material. We granted Brown's subsequent motion to vacate the stay and reinstated the direct appeal, and then consolidated the direct and postconviction appeals.

Brown now argues that he is entitled to a new trial for five reasons. First, the trial court violated his right to a public trial. Second, the trial court committed reversible error when it admitted evidence of the Richfield shooting incident. Third, the trial court committed plain error in its aiding-and-abetting jury instruction. Fourth, the trial court committed plain error when it admitted expert gang testimony. Fifth, the trial court erred in denying a motion for a new trial after the State failed to disclose impeaching evidence. Because the facts of this case do not implicate the right to a public trial, the trial court did not err in its evidentiary rulings or its jury instructions, and the undisclosed impeachment evidence was not material, we affirm.

## I.

█ We begin with Brown's argument that his constitutional right to a public trial

was violated. Brown asserts that the act of locking the courtroom during jury instructions implicated his right to a public trial. Based on that assertion, Brown contends that the trial court was required to make findings in accordance with *Waller v. Georgia,* 467 U.S. 39, 45, 104 S.Ct. 2210, 81 L.Ed.2d 31 (1984).[3] Brown contends that, because the trial court failed to make such findings and because the act of locking the courtroom during jury instructions was not narrowly tailored to an overriding interest, he is entitled to a new trial. We conclude that the act of locking the courtroom doors during jury instructions did not implicate Brown's right to a public trial.

 Whether the right to a public trial has been violated is a constitutional issue that we review de novo. *State v. Mahkuk,* 736 N.W.2d 675, 684 (Minn.2007). Both the Sixth Amendment to the United States Constitution and Article I, Section 6, of the Minnesota Constitution provide that "the accused shall enjoy the right to a ... public trial." Denials of the public trial guarantee constitute structural error not subject to harmless error review. *State v. Bobo,* 770 N.W.2d 129, 139 (Minn. 2009).

 The purpose of the public trial guarantee is " 'for the benefit of the accused; that the public may see he is fairly dealt with and not unjustly condemned, and that the presence of interested spectators may keep his triers keenly alive to a sense of their responsibility and to the importance of their functions.' " *Waller,* 467 U.S. at 47–48, 104 S.Ct. 2210 (quoting *Gannett Co. v. DePasquale,* 443 U.S. 368, 380, 99 S.Ct. 2898, 61 L.Ed.2d 608 (1979)) (holding that the total closure of a courtroom from all spectators or press during a pretrial suppression hearing violated the Sixth Amendment's public trial guarantee). In addition, "a public trial encourages witnesses to come forward and discourages perjury." *Id.* at 46, 104 S.Ct. 2210. Almost twenty years before *Waller,* we affirmed the right to a public trial by explaining:

In our opinion, the constitutional mandate contemplates that an accused be afforded all possible benefits that a trial open to the public is designed to assure. Unrestricted public scrutiny of judicial action is a meaningful assurance to an accused that he will be dealt with justly, protected not only against gross abuses of judicial power but also petty arbitrariness. The presence of an audience does have a wholesome effect on trustworthiness since witnesses are less likely to testify falsely before a public gathering. Further, the possibility that some spectator drawn to the trial may prove to be

---

3. The right to a public trial is not absolute and the analysis set forth in *Waller,* 467 U.S. at 45, 104 S.Ct. 2210, explains the process for determining whether the right to a public trial must give way. In accordance with *Waller,* we have explained that the party seeking to close the hearing must advance an overriding interest that is likely to be prejudiced; the closure must be no broader than necessary to protect that interest; and the court must consider reasonable alternatives to closing the hearing. *State v. Mahkuk,* 736 N.W.2d 675, 684–85 (Minn.2007). To ensure meaningful appellate review of *Waller* issues, courts are required to " 'make[ ] findings adequate to support the closure.' " *Id.* at 685 (alteration in original) (quoting *Waller,* 467 U.S. at 48, 104 S.Ct. 2210); *see State v. Fageroos,* 531 N.W.2d 199, 203 (Minn.1995) (remanding for a hearing to allow the trial court an opportunity to make a better record in support of its decision to close the trial); *State v. McRae,* 494 N.W.2d 252, 260 (Minn.1992) (holding that a new trial was required when the stated explanation for the closure would not satisfy *Waller* and other constitutional violations were alleged). We note, with some concern, that the trial court in this case did not provide any explanation as to why the courtroom doors were locked during the time the jury was being instructed.

an undiscovered witness in possession of critical evidence cannot be ignored. It is not unrealistic even in this day to believe that public inclusion affords citizens a form of legal education and hopefully promotes confidence in the fair administration of justice.

*State v. Schmit,* 273 Minn. 78, 86–88, 139 N.W.2d 800, 806–07 (1966) (footnotes omitted) (holding that the closure of a trial to all spectators but "the bar and press" could not be constitutionally justified despite the potentially lurid nature of a sodomy trial). The Supreme Court has held that the public trial guarantee applies to all phases of trial, including pretrial suppression hearings and jury voir dire. *See Presley v. Georgia,* 558 U.S. 209, 130 S.Ct. 721, 723–24, 175 L.Ed.2d 675 (2010); *Waller,* 467 U.S. at 46–48, 104 S.Ct. 2210; *see also State v. Lawrence,* 167 N.W.2d 912, 915 (Iowa 1969) ("All authorities agree that, in the absence of legitimate reasons for limiting public attendance in criminal trials, the concept of public trial includes the entire trial from the impaneling of the jury to the rendering of its verdict.").

█ Not all courtroom restrictions implicate a defendant's right to a public trial. *See State v. Lindsey,* 632 N.W.2d 652, 660–61 (Minn.2001). In *Lindsey,* we held that the act of excluding two minors from observing a criminal trial was "not a true closure, in the sense of excluding all or even a significant portion of the public from the trial." *Id.* at 660. In reaching our holding in *Lindsey,* we concluded the

closure in question was so trivial that it did not implicate Lindsey's right to a public trial, thereby eliminating any need to conduct a *Waller* analysis.[4] *Id.* at 660–61. We identified several factors that led us to conclude that the closure " 'was too trivial to amount to a violation of the [Sixth] Amendment.' " *Id.* at 660 (alteration in original) (quoting *Peterson v. Williams,* 85 F.3d 39, 42 (2d Cir.1996)). These factors included: that the courtroom was never "cleared of all spectators"; that the trial remained open to the general public and the press; that there was no period of the trial in which members of the general public were absent during the trial; and that at no time was the defendant, his family, his friends, or any witness improperly excluded. *Id.* at 661.

More recently, in *State v. Caldwell,* 803 N.W.2d 373, 390 (Minn.2011), we rejected Caldwell's claim that his right to a public trial was violated. We explained that "the district court excluded only Caldwell's mother when she repeatedly disrupted court proceedings, and never excluded all spectators from the courtroom even when the court locked the courtroom doors [before instructing the jury]." *Id.*

Consistent with our analysis in *Lindsey* and *Caldwell,* we reject Brown's claim that the trial court violated his right to a public trial. While the trial court did lock the courtroom doors during jury instructions, the courtroom was never cleared of all spectators, and the judge in fact told the

4. Brown contends that *Mahkuk,* 736 N.W.2d 675, rather than *Lindsey* controls the outcome of this case. We disagree. In *Mahkuk,* the State did not argue that the trial court's decision to remove identified gang members from the courtroom during the testimony of certain lay witnesses was so trivial as to not violate Mahkuk's Sixth Amendment right to a public trial. *Id.* at 684–85. Instead, the State cited a federal court decision that had held that partial courtroom closures (orders that ex-

cluded some but not all of the public), required a substantial reason, not an overriding interest for the exclusion of the identified gang members. *Id.* at 685. We rejected the State's argument, explaining that, unlike the federal courts, we had "not applied different tests to complete versus partial closures." *Id.* Nothing in *Mahkuk* called into question our conclusion in *Lindsey* that some trial court actions are so trivial that they do not implicate a defendant's right to a public trial.

people in the courtroom that they were "welcome to s[t]ay." The trial remained open to the public and press already in the courtroom and the trial court never ordered the removal of any member of the public, the press, or the defendant's family.[5] In addition, the jury instructions did not comprise a proportionately large portion of the trial proceedings. All of these circumstances, taken together, convince us that the trial court's conduct did not implicate Brown's right to a public trial.

Our holding that the closure here did not implicate Brown's right to a public trial notwithstanding, we caution that the act of locking courtroom doors during jury instructions creates the appearance that Minnesota's courtrooms are closed or inaccessible to the public. Trial courts should therefore commit such acts carefully and sparingly. *See United States v. Scott,* 564 F.3d 34, 39 (1st Cir.2009) (explaining that "a procedure such as [locking the doors during jury instructions] should be employed only carefully and sparingly, in order to avoid even the appearance that our nation's courtrooms are closed or inaccessible to the public"). To facilitate appellate review in future cases, we conclude the better practice is for the trial court to expressly state on the record why the court is locking the courtroom doors.

## II.

■ Brown next argues that the trial court committed reversible error when it admitted evidence of the Richfield shooting incident. Specifically, Brown contends that the Richfield shooting evidence was not "inextricably intertwined" with Miller's murder because the two crimes were nei-

ther temporally nor causally related. Because we conclude that the trial court properly admitted the Richfield shooting evidence under Minn. R. Evid. 404(b), we need not, and do not, decide whether the Richfield shooting evidence was temporally or causally related to Miller's murder.

At Brown's *Rasmussen* hearing, the defense moved to exclude evidence related to the Richfield shooting incident, arguing that the evidence involved a previous bad act that was inadmissible under *State v. Spreigl,* 272 Minn. 488, 139 N.W.2d 167 (1965) and Minn. R. Evid. 404(b). The State argued that the evidence was admissible as "inextricably intertwined" evidence because the State's forensic expert would testify that the .9mm bullet casing found in the Richfield shooting matched the .9mm bullet casing found near Miller's body, thereby linking Brown to the scene of the murder. In the alternative, the State argued that the evidence was admissible under Minn. R. Evid. 404(b) to prove identity, opportunity, and lack of mistake or accident.

The trial court agreed with the State and ruled the Richfield shooting evidence was inextricably intertwined with Miller's murder and admissible "under the evidentiary rules." The trial court emphasized that the Richfield shooting evidence was being offered "for the limited purpose of connecting [Brown] to possession of one of the guns that was used at the scene of the homicide itself, by way of forensic evidence, that linked a shell casing found at the scene of the Richfield crime ... to a shell casing that was found at the scene of the homicide." [6]

---

**5.** Brown claims that because the doors were locked, any family member or friend that tried to enter the courtroom during the jury instructions was prevented from doing so. However, nothing in the trial court or postconviction court record provides factual support for any claim that any particular person was denied entrance.

**6.** The *Rasmussen* hearing transcript is not in the record. The quotation comes from the postconviction court's order denying relief,

■ We review evidentiary rulings for an abuse of discretion. *State v. Riddley*, 776 N.W.2d 419, 424 (Minn.2009). In order to prevail on a claim that a trial court improperly admitted evidence under Rule 404(b), the defendant "has the burden to show the admission was both erroneous and prejudicial." *Id.*

We have long held that "[t]he general rule in a criminal case is that evidence which in any manner shows or tends to show that the accused has committed another crime independent of that for which he is on trial is inadmissible." *State v. Sweeney*, 180 Minn. 450, 455, 231 N.W. 225, 227 (1930). In *Sweeney*, we explained that the general rule, however, does not prohibit the admission of other-crime evidence that "tends to establish (1) motive, (2) intent, (3) absence of mistake or accident, (4) the identity of the accused, (5) sex crimes, (6) a common scheme or plan embracing the commission of similar crimes so related to each other that proof of one or more of such tends to establish the accusation." *Id.* at 455, 231 N.W. at 227. In considering whether evidence of a defendant's previous possession of a gun was admissible under an exception to the general rule, we have acknowledged that "evidence of [previous] possession of a gun is not rendered inadmissible merely because it may indicate or have an 'incidental tendency' to implicate the defendant in unrelated offenses." *State v. Wofford*, 262 Minn. 112, 119, 114 N.W.2d 267, 272 (1962).

We have since incorporated the general rule and exceptions discussed in *Sweeney* into Minn. R. Evid. 404(b). Rule 404(b) reads in relevant part:

Evidence of another crime, wrong, or act is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however,

however, and neither party disputes its accu-

be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. In a criminal prosecution, such evidence shall not be admitted unless 1) the prosecutor gives notice of its intent to admit the evidence consistent with the rules of criminal procedure; 2) the prosecutor clearly indicates what the evidence will be offered to prove; 3) the other crime, wrong, or act and the participation in it by a relevant person are proven by clear and convincing evidence; 4) the evidence is relevant to the prosecutor's case; and 5) the probative value of the evidence is not outweighed by its potential for unfair prejudice to the defendant.

Minn. R. Evid. 404(b).

For the following reasons, we conclude that the trial court did not abuse its discretion when it concluded that the Richfield shooting evidence was admissible "under the rules of evidence." First, evidence of Brown's admitted participation in the Richfield shooting incident was probative on the issue of the identity of the perpetrator in the murder case because a .9mm bullet casing found at the Richfield shooting matched the .9mm bullet casing found near Miller's body. *See* Minn. R. Evid. 402. Second, the videotape of Brown leaving jail wearing a white tank top and large necklace 12 hours before Miller's murder was probative on the relevant issues of identity and opportunity. *Id.* Third, the fact that the evidence in question incidentally implicated Brown in another crime did not render the evidence inadmissible. *See* Minn. R. Evid. 404(b) (allowing the admission of other-crime evidence that is offered to prove identity or opportunity); *Wofford*, 262 Minn. at 118, 114 N.W.2d at 271 (holding that "[t]he state may prove all relevant facts and circumstances which

racy.

tend to establish any of the elements of the offense with which the accused is charged, even though such facts and circumstances may prove or tend to prove that the defendant committed other crimes"). Fourth, the State complied with the notice requirements set forth in Rule 404(b). Fifth, the probative value of the evidence in question outweighed any risk of unfair prejudice, especially when the court gave the jury a cautionary instruction in connection with the evidence. Because the Richfield shooting evidence was properly admitted under Minn. R. Evid. 404(b), we reject Brown's argument that admission of the evidence constituted reversible error.

### III.

■ Brown next argues that the trial court committed plain error when it admitted Sergeant Hauge's expert gang testimony. Sergeant Hauge testified for the State as a gang expert and described Minneapolis gangs, including the Shotgun Crips: their participation in criminal activities; and some rituals and inner workings of gang memberships and hierarchies.

■ Brown did not object to the expert gang testimony at trial. We review the admission of unobjected-to gang expert testimony for plain error. *State v. Martinez*, 725 N.W.2d 733, 738–39 (Minn.2007). Under plain-error analysis, Brown must show that: (1) there was error; (2) that was plain; and (3) his substantial rights were affected. *State v. Griller*, 583 N.W.2d 736, 740 (Minn.1998). "An error is 'plain' if it is clear or obvious." *State v. Kuhlmann*, 806 N.W.2d 844, 853 (Minn. 2011) (quoting *State v. Jones*, 753 N.W.2d 677, 686 (Minn.2008)). "If these three prongs are met, the reviewing court then assesses whether it should address the error to ensure the fairness and integrity of the judicial proceedings." *State v. Gomez*, 721 N.W.2d 871, 880 (Minn.2006).

The defendant has the burden of proof on the third element of the test, and it is considered a "heavy burden." *Griller*, 583 N.W.2d at 741. If we conclude that any prong of the plain error analysis is not satisfied, we need not consider the other prongs. *Montanaro v. State*, 802 N.W.2d 726, 732 (Minn.2011).

Under Minn. R. Evid. 702, an expert witness may testify if the opinion proffered "will assist the trier of fact to understand the evidence or to determine a fact in issue." Minn. R. Evid. 702. General testimony about the workings of a gang or the types of activities in which gangs engage is not considered testimony that reaches an ultimate legal conclusion, and is often necessary to prove that a crime was committed "for the benefit of a gang." *State v. Jackson*, 714 N.W.2d 681, 692 (Minn.2006). We have previously affirmed the admission of gang expert testimony similar to that given by Sergeant Hauge. *State v. McDaniel*, 777 N.W.2d 739, 748–49 (Minn. 2010). Having affirmed the admission of similar gang expert testimony, we are unable to conclude that the alleged error in this case was clear and obvious. We therefore conclude that the trial court did not commit plain error in admitting Sergeant Hauge's expert gang testimony.

### IV.

■ Brown also argues that the trial court's aiding-and-abetting jury instructions constituted plain error because the instructions as given "allowed the jury to find Brown guilty if it found that he was intentionally present at the murder without also finding that it was Brown's intent that his presence aid or encourage the murder." We disagree.

■ Brown was charged with aiding and abetting four counts of murder under Minn.Stat. § 609.05, subd. 1. "A person is criminally liable for a crime committed by

another if the person intentionally aids, advises, hires, counsels, or conspires with or otherwise procures the other to commit the crime." *Id.* Mere presence at the scene of a crime does not give rise to accomplice liability. *State v. Ostrem*, 535 N.W.2d 916, 924 (Minn.1995).

At the conclusion of closing arguments, the trial court gave the following instruction on the elements of aiding and abetting murder:

> Now, a person is guilty of a crime if he acts alone in commission of that crime or if he intentionally aid[s], advises, counsels or conspires with others to commit that crime.

> In order to aid and abet others in the commission of a crime, it is necessary that the Defendant voluntarily associate himself with and participate in the criminal venture and that he do or say something to help the criminal venture succeed.

> If you find that the State has shown that the Defendant played some knowing role in the commission of the crime or crimes and made no reasonable efforts to pre[v]ent the crime or crimes before the crime was committed, the Defendant is guilty of aiding and abetting in the commission of the crime or crimes.

> The phrase, knowing role, here can include aiding, advising, hiring, [counseling], conspiring with or procuring another to commit a crime.

> A person's presence does constitute aiding and abetting if it is done intentionally and if it also aid[s] or encourages the commission of the crime to any degree. However, something more than mere presence, knowledge, inaction or passive acquiescence is required.

> A person's presence, companionship and conduct after an offense are rele-

vant circumstances from which a person's criminal intent may be inferred.

 Brown did not object to the jury instructions at trial. We review unobjected-to jury instructions for plain error. *State v. Laine*, 715 N.W.2d 425, 432 (Minn. 2006).

We conclude that the trial court did not err in giving the aiding-and-abetting instructions. Brown's reliance on *Mahkuk*, in which we concluded the trial court improperly eliminated the intent requirement for accomplice liability, is misplaced. 736 N.W.2d at 682–83. In *Mahkuk*, the trial court used permissive language that instructed the jury it "could" consider presence in such a manner that it eliminated the State's burden to prove intent. *Id.* Here, the jury was instructed that the State had the burden to prove all of the elements of the offense charged by proof beyond a reasonable doubt, and no such permissive language was used. We therefore conclude that, reading the instructions as a whole, the instructions did not relieve the State of its burden of proof on the elements of aiding and abetting murder, and therefore the trial court did not err in its jury instruction, much less commit plain error.

## V.

 Finally, Brown argues that he is entitled to a new trial because the State failed to disclose a plea agreement between State witness C.W. and another county attorney's office. The State concedes that it did not disclose the plea agreement before the conclusion of trial, but argues that a new trial is not justified because the undisclosed impeachment evidence was not material.

 We review a postconviction court's decision to deny a new trial for an abuse of discretion. *Wieland v. State*, 457

N.W.2d 712, 714 (Minn.1990). We review questions of law de novo. *Leake v. State,* 737 N.W.2d 531, 535 (Minn.2007).

 A failure by the State to disclose material, exculpatory evidence justifies a new trial. *Brady v. Maryland,* 373 U.S. 83, 87–88, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). More specifically, "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Id.* at 87, 83 S.Ct. 1194. To establish a *Brady* violation, it must be true that: (1) the evidence at issue is favorable to the accused, either because it is exculpatory or it is impeaching; (2) the evidence was willfully or inadvertently suppressed by the State; and (3) prejudice to the accused resulted. *Pederson v. State,* 692 N.W.2d 452, 459 (Minn.2005). A *Brady* violation, however, only requires reversal of a conviction "if the evidence is material in the sense that its suppression undermines confidence in the outcome of the trial." *United States v. Bagley,* 473 U.S. 667, 678, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985); *Giglio v. United States,* 405 U.S. 150, 154, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972).

We conclude that the postconviction court did not abuse its discretion in declining to order a new trial. Although the plea deal between C.W. and the other county attorney's office constituted impeachment evidence, this undisclosed impeachment evidence was not material because its suppression does not undermine our confidence in the outcome of the trial. C.W. was impeached with five felony convictions that were all disclosed on the record and his plea agreement with the Hennepin County Attorney's Office that was more favorable than the plea agreement reached with the other county attorney's office. Thus, even if the State had timely disclosed C.W.'s plea agreement with the other county attorney's office and Brown had been able to exploit that plea agreement to its full potential, it would not have changed our confidence in the outcome of the trial.

In sum, we affirm Brown's conviction because the facts of this case do not implicate the right to a public trial, the trial court did not err in its evidentiary rulings or its jury instructions, and the undisclosed impeachment evidence was not material.

Affirmed.

MEYER, Justice (dissenting).

I respectfully dissent. I believe that the trial court's decision to close and lock the courtroom doors during jury instructions contravened the purposes of the public trial guarantee, requiring the district court to conduct an analysis pursuant to *Waller v. Georgia,* 467 U.S. 39, 45, 104 S.Ct. 2210, 81 L.Ed.2d 31 (1984). Because the trial court failed to articulate any reason to justify locking the doors for a portion of the trial under the *Waller* factors, I would remand the case to the postconviction court for an evidentiary hearing and findings in accordance with *State v. Fageroos,* 531 N.W.2d 199, 203 (Minn.1995). In reaching this conclusion, I first look to the standard for determining whether a courtroom closure has occurred, and then apply that standard to the facts in this case.

A.

The right to a public trial is guaranteed by both the United States and Minnesota Constitutions. *See* U.S. Const. amend. VI ("In all criminal prosecutions, the accused shall enjoy the right to a . . . public trial."); Minn. Const. art. 1, § 6 (same); *In re Oliver,* 333 U.S. 257, 266–71, 68 S.Ct. 499, 92 L.Ed. 682 (1948) (outlining the history

and purpose of public trials in the United States). The purpose of the public trial guarantee " 'is for the benefit of the accused; that the public may see he is fairly dealt with and not unjustly condemned, and that the presence of interested spectators may keep his triers keenly alive to a sense of their responsibility and to the importance of their functions.' " *Waller*, 467 U.S. at 46, 104 S.Ct. 2210 (quoting *Gannett Co. v. DePasquale*, 443 U.S. 368, 380, 99 S.Ct. 2898, 61 L.Ed.2d 608 (1979)). A public trial encourages witnesses to come forward, discourages perjury, and provides a "meaningful assurance to an accused that he will be dealt with justly, protected not only against gross abuses of judicial power but also petty arbitrariness." *State v. Schmit*, 273 Minn. 78, 86–88, 139 N.W.2d 800, 806–07 (1966). All portions of a jury or bench trial are subject to the public trial guarantee, including suppression hearings conducted prior to the presentation of evidence to the jury and jury voir dire. *See Presley v. Georgia*, 558 U.S. 209, 130 S.Ct. 721, 723–24, 175 L.Ed.2d 675 (2010) (voir dire); *Waller*, 467 U.S. at 46–47, 104 S.Ct. 2210 (pretrial suppression hearing); *Oliver*, 333 U.S. at 265, 68 S.Ct. 499 (summary trial for contempt of court at a grand jury proceeding); *see also Press–Enterprise Co. v. Superior Court of Cal., Riverside Cnty.*, 464 U.S. 501, 509 n. 8, 104 S.Ct. 819, 78 L.Ed.2d 629 (1984) (noting that the public trial guarantee is broader than double jeopardy protections because the fundamental openness requirement of the public trial guarantee spans all trial proceedings); *State v. Lawrence*, 167 N.W.2d 912, 915 (Iowa 1969) ("All authorities agree that, in the absence of legitimate reasons for limiting public attendance in criminal trials, the concept of public trial includes the entire trial from the impaneling of the jury to the rendering of its verdict.").

The right to a public trial is not only for the accused, but also the public and the press, and is a fundamental part of Anglo–American jurisprudence. *See Press–Enterprise*, 464 U.S. at 507, 104 S.Ct. 819 ("This open process gave assurance to those not attending trials that others were able to observe the proceedings and enhanced public confidence. The presence of bystanders served yet another purpose according to Blackstone. If challenges kept a sufficient number of qualified jurors from appearing at the trial, 'either party may pray a *tales.*' ") (quoting 3 W. Blackstone, Commentaries 364 (13th ed. 1800)); *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 569, 100 S.Ct. 2814, 65 L.Ed.2d 973 (1980) ("[T]he historical evidence demonstrates conclusively that at the time when our organic laws were adopted, criminal trials both here and in England had long been presumptively open. This is no quirk of history; rather, it has long been recognized as an indispensable attribute of an Anglo–American trial.").

In recent years, the Supreme Court has reaffirmed its strong protection of the public trial right, despite increasing encroachments by trial and appellate courts around the country. *See Presley*, 130 S.Ct. at 723–24 (holding that no part of the trial process is exempt from the public trial guarantee); *see also* Daniel Levitas, Comment, *Scaling* Waller: *How Courts Have Eroded the Sixth Amendment Public Trial Right*, 59 Emory L.J. 493, 494 (2009) (arguing that despite the Supreme Court's consistent reaffirmation of a robust right to a public trial, trial judges and appellate courts often remain "unwilling to enforce this fundamental right" and "persist in upholding improper courtroom closures"). In addition to this general guarantee, the Supreme Court has held that the presence at trial of family members and friends of the defendant holds special constitutional

import. *Oliver*, 333 U.S. at 271–72, 68 S.Ct. 499 ("[W]ithout exception all courts have held that an accused is at the very least entitled to have his friends, relatives and counsel present, no matter with what offense he may be charged." (footnote omitted)).

The public trial guarantee is an obligation of the trial court, and any party seeking to close the courtroom has the burden to advance an overriding interest in closure; it is not the burden of the defendant or any person seeking access to advance a justification for openness. As the Court said in *Presley*, "[t]rial courts are obligated to take every reasonable measure to accommodate public attendance at criminal trials." 130 S.Ct. at 725. Thus, it is irrelevant whether a defendant objects to the courtroom closure, because courts have an obligation to preserve the "presumption of openness [that] inheres in the very nature of a criminal trial under our system of justice." *Richmond Newspapers*, 448 U.S. at 573, 100 S.Ct. 2814.

Despite this protection, our court has held that a trial court may avoid a *Waller* analysis when the " 'unjustified closure . . . was too trivial to amount to a violation of the [Sixth] Amendment.' " *State v. Lindsey*, 632 N.W.2d 652, 660 (Minn.2001) (alterations in original) (quoting *Peterson v. Williams*, 85 F.3d 39, 42 (2d Cir.1996)). A closure is too trivial to implicate the public trial guarantee when it does not impede the goals furthered by the guarantee. *See Peterson*, 85 F.3d at 43 (characterizing these goals as "1) to ensure a fair trial; 2) to remind the prosecutor and judge of their responsibility to the accused and the importance of their functions; 3) to encourage witnesses to come forward; and 4) to discourage perjury"). In evaluating these goals, relevant factors include the length of the closure, the people excluded

from the courtroom, the subjects discussed during the closure, whether the trial court intended the closure to occur, and the justifications given by the trial court for closure. *Accord United States v. Perry*, 479 F.3d 885, 890–91 (D.C.Cir.2007); *Carson v. Fischer*, 421 F.3d 83, 93–94 (2d Cir.2005); *Peterson*, 85 F.3d at 43.

A conclusion that the trial court's decision to lock the doors for the duration of jury instructions implicates the public trial guarantee does not end the inquiry. Traditionally, courtroom closures that implicate the public trial right are divided into two categories: (1) total or complete closures and (2) partial closures. A total or complete closure occurs when all members of the public, including the press, are excluded from all or a significant portion of the trial. *Woods v. Kuhlmann*, 977 F.2d 74, 76 (2d Cir.1992) (noting that *Waller* involved "the *total closure* of a suppression hearing in which *all* persons other than witnesses, court personnel, the parties and their lawyers were excluded for the duration of the hearing"). A partial closure, on the other hand, occurs when only some, but not all, members of the public, usually in the form of a class of people (the press, children, etc.) or specific individuals, are excluded from the trial, or when the exclusion occurs for a limited portion of the trial, or when some combination of those exclusions occurs. *Id.* (describing the closure at issue as partial because it involved an exclusion of only members of the defendant's family and only during the testimony of one witness). We have rejected any distinction between partial and total closures, requiring that the *Waller* framework apply to all courtroom closures. *State v. Mahkuk*, 736 N.W.2d 675, 685 (Minn.2007) (declining to apply the "substantial reason" test to partial closures).[1]

---

1. Many federal appellate courts, however, ap- ply a modified *Waller* test to cases involving a

If the actions taken by a trial court implicate the public trial right, a trial court must apply the *Waller* standards before excluding the public:

"[T]he party seeking to close the hearing must advance an overriding interest that is likely to be prejudiced, the closure must be no broader than necessary to protect that interest, the trial court must consider reasonable alternatives to closing the proceeding, and it must make findings adequate to support the closure."

*Presley,* 130 S.Ct. at 724 (quoting *Waller,* 467 U.S. at 48, 104 S.Ct. 2210) (alteration in original). Trial courts are obligated to take these steps even when the parties do not themselves identify the relevant issues. *Id.* at 724–25 ("The conclusion that trial courts are required to consider alternatives to closure even when they are not offered by the parties is clear not only from this Court's precedents but also [because] the public has a right to be present whether or not any party has asserted the right."). Thus, if the actions taken by the trial court in this case constitute a courtroom closure, then the court was required to consider alternatives to closure.

### B.

Here, the trial court closed and locked the courtroom doors for the entire duration of the jury instructions. In doing so, the court said:

For the benefit of those in the back. I am about to begin giving jury instruc-

tions. While that is going on the courtroom is going to be locked and people are not going to be allowed to go in and out.

So, if anybody has to leave, now would be the time. You are welcome to s[t]ay. But I just want to make sure that everybody knows that the courtroom is going to be locked. We are all good? Deputy?

While the trial court's colloquy indicates that members of the public were present immediately prior to jury instructions, the record does not reflect whether any members of the public stayed for jury instructions. The record lacks evidence that any specific person attempted to enter after the doors were locked; Brown nevertheless argues that members of the public, including his family members and friends, were denied entrance during jury instructions. Additionally, the trial court did not give any reason why the courtroom doors needed to be locked, or identify any disruptions that justified locking the doors. The trial court also did not give prior notice during the trial that the doors would be locked for jury instructions such that Brown's friends or family members, members of the press, or other members of the public knew in advance that they needed to be in the courtroom at the start of jury instructions in order to observe them.

I would hold that locking a courtroom such that the public may not enter or exit for any portion of a trial constitutes a partial courtroom closure that implicates

---

partial closure. *Garcia v. Bertsch,* 470 F.3d 748, 753 (8th Cir.2006) (noting that the Second, Eighth, Ninth, Tenth, and Eleventh Circuits all apply a less stringent "substantial reason" test instead of *Waller* in the case of a partial courtroom closure). In *Mahkuk,* I suggested that our court would be better served by following the federal standard and modifying the first prong of the *Waller* analysis in the case of partial courtroom closures. 736 N.W.2d at 691 (Meyer, J., concurring).

Because "the defendant's right to a public trial is less likely to be violated during a partial closure," I would apply a modified *Waller* test in partial closures such as the one at issue here. *Id.* at 690. That being said, even under the "substantial reason" standard, I would conclude that a trial court that gives no reason for closing the courtroom during jury instructions, a critical stage of trial, has not advanced a substantial reason justifying closure.

the public trial right. It seems to me that the concerns outlined here by the appellant mirror those in *Presley:* while there may be justifications for locking the doors during jury instructions, "[t]rial courts are obligated to take every reasonable measure to accommodate public attendance at criminal trials." 130 S.Ct. at 725. The act of locking the doors such that the public may not enter or exit for the duration of jury instructions certainly contravenes the "presumption of openness" at the heart of the public trial guarantee. *Richmond Newspapers,* 448 U.S. at 573, 100 S.Ct. 2814. This is especially true when the closure implicates a discrete portion of the trial process: in *Presley,* it was voir dire; here, it is jury instructions. *See* 130 S.Ct. at 724. Thus, even though Brown did not object to the courtroom closure and the State did not argue for closure, the trial court was obligated under *Waller* to justify why a closure was necessary. *Fageroos,* 531 N.W.2d at 202.

Instead of applying the "well settled" principles of *Presley,* 130 S.Ct. at 724, the majority holds that *Lindsey* indicates that locking the courtroom doors during jury instructions was too trivial to implicate Brown's public trial right. *See Lindsey,* 632 N.W.2d at 660. The majority's reasoning here is flawed. For one, the act of locking the doors to the courtroom is by definition a "closed" courtroom—it makes it impossible for the public to enter or leave. Second, the actions of the trial court in *Lindsey* are distinguishable: there, the trial court gave some articulation of the reason why specific spectators were excluded—the spectators at issue were minors and statutorily prohibited from observing. *See id.* at 657. Here, the trial court did not exclude specific spectators for a justified reason and did not articulate any reason at all why the courtroom should be locked. Thus, it is not clear that the rationale of *Lindsey* is still controlling in light of *Presley.*

Even applying the *Lindsey* standard, the values of the public trial guarantee are sufficiently implicated under the facts of this case such that a *Waller* analysis is required. Discussing jury instructions implicates the public trial guarantees because doing so publicly reminds "the prosecutor and judge of their responsibility to the accused and the importance of their functions" and in ensuring a fair trial in general, though it does not implicate witness testimony or the prevention of perjury. *Peterson,* 85 F.3d at 43. While not all spectators were excluded from the courtroom, the closure excluded any person who arrived at court after jury instructions began. Brown alleges that members of his family and the press may have arrived during the jury instructions and were denied access to the courtroom. The potential exclusion of Brown's family members implicates the public trial right. *Oliver,* 333 U.S. at 271–72, 68 S.Ct. 499. The exclusion of family members, " 'even from part of a criminal trial, is not a step to be taken lightly.' " *Carson,* 421 F.3d at 91 (quoting *Guzman v. Scully,* 80 F.3d 772, 776 (2d Cir.1996)). The record does not establish whether Brown had other family members already present in the courtroom, whether those family members stayed through the jury instructions, and how many family members were excluded from being spectators.

Finally, in terms of the intention of the closure and justifications given, it is clear that this closure was not inadvertent: the trial court intended to close the courtroom. Additionally, the court did not give an administrative or order-based reason for locking the doors. The lack of any articulated justification for closure contravenes the goal of openness inherent in the public trial guarantee. *See Presley,* 130 S.Ct. at 725. There is nothing in the record or asserted by the State that indicates that a

closure was necessitated here by the complexity of the charge, the confusion of the jury, or some other reason. *Accord Scott,* 564 F.3d at 38.

The majority focuses on the lack of evidence that any specific person was actually excluded from the courtroom. But as the Texas Court of Criminal Appeals recently held in finding a public trial violation, the focus on actual exclusion asks the wrong question:

> When determining whether a defendant has proved that his trial was closed to the public, the focus is not on whether the defendant can show that someone was actually excluded. Rather, a reviewing court must look to the totality of the evidence and determine whether the trial court fulfilled its obligation "to take every reasonable measure to accommodate public attendance at criminal trials."

*Lilly v. State,* No. PD–0658–11, 2012 WL 1314088, at *7 (Tex.Crim.App. Apr. 18, 2012) (quoting *Presley,* 130 S.Ct. at 725).

Other courts have also concluded that impeding access by the public to the courtroom without justification implicates the public trial right. *See, e.g., Walton v. Briley,* 361 F.3d 431, 433 (7th Cir.2004) (concluding that holding court sessions late at night when the public could not access the courtroom violated the right to a public trial); *Commonwealth v. Cohen,* 456 Mass. 94, 921 N.E.2d 906, 923 (2010) (holding that the placement of a "Do Not Enter" sign during jury selection implicated the public trial right because "[c]losure by policy runs counter to the requirement that a court make a case-specific determination before a closure of any part of a criminal proceeding constitutionally may occur"); *People v. Martin,* 16 N.Y.3d 607, 925 N.Y.S.2d 400, 949 N.E.2d 491, 494–96 (2011) (holding that preventing defendant's father from attending voir dire without adequate justification justified a new trial);

*State v. Bowen,* 157 Wash.App. 821, 239 P.3d 1114, 1120 (2010) (holding that moving voir dire into chambers such that the public could not access or observe proceedings violated the public trial guarantee); *State v. Vanness,* 304 Wis.2d 692, 738 N.W.2d 154, 158–59 (Wis.Ct.App.2007) (holding that the right to a public trial was violated when the courthouse was locked for more than an hour of the trial). I would agree with the reasoning of these courts and hold that preventing the public from accessing Brown's trial during jury instructions sufficiently implicated the public trial guarantee that it necessitated *Waller* findings.

In conclusion, I would remand to the district court for an evidentiary hearing on the issues of whether the press and Brown's family attempted to enter the courtroom after the doors were locked and whether any member of the press or Brown's family were excluded from the courtroom during the jury instructions. In doing so, the postconviction court should evaluate the factors outlined above and take evidence on such questions. *See Fageroos,* 531 N.W.2d at 201, 203 (remanding for an evidentiary hearing and findings because the courtroom closure was authorized by statute and not analyzed under the *Waller* factors). The postconviction court should also analyze the reasons for the courtroom closure and conduct a *Waller* analysis if required. *See id.* at 203; *see also Presley,* 130 S.Ct. at 725 (concluding that only one *Waller* factor need be violated to constitute structural error and justify a new trial).

ANDERSON, PAUL H., Justice (dissenting).

I join in the dissent of Justice Meyer.