*This opinion will be unpublished and
may not be cited except as provided by
Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A14-1998**

State of Minnesota,
Respondent,

vs.

Billy Ray Garrison,
Appellant.

**Filed November 16, 2015
Affirmed
Johnson, Judge**

Koochiching County District Court
File No. 36-CR-13-782

Lori Swanson, Attorney General, Karen B. Andrews, Assistant Attorney General, St. Paul, Minnesota; and

Jeffrey S. Naglosky, Koochiching County Attorney, International Falls, Minnesota (for respondent)

Cathryn Middlebrook, Chief Appellate Public Defender, Davi Elstan Forte Axelson, Assistant State Public Defender, St. Paul, Minnesota (for appellant)

Considered and decided by Kirk, Presiding Judge; Johnson, Judge; and Bjorkman, Judge.

**U N P U B L I S H E D   O P I N I O N**

**JOHNSON**, Judge

A Koochiching County jury found Billy Ray Garrison guilty of multiple offenses based on evidence that he held his girlfriend captive for several hours, during which time

he beat her and sexually assaulted her. During the trial, the district court implemented certain procedures that were designed to maintain order and decorum in the courtroom. Garrison argues that the district court's courtroom-management procedures caused the courtroom to be closed to the public, thereby violating his Sixth Amendment right to a public trial. We conclude that the courtroom was not closed for purposes of Garrison's constitutional right to a public trial. Therefore, we affirm.

## FACTS

During the nighttime hours of November 28, 2013, Garrison engaged in various forms of violence toward his girlfriend, M.N. For example, Garrison struck M.N. multiple times with his hands and fists. He repeatedly prevented her from breathing by covering her mouth and nose. He picked her up and threw her down on the floor. He dragged her on the floor by her hair. He "hog-tied" her by tying a nylon rope around her neck, wrists, and ankles and then raped her. After several hours, M.N. was able to escape to her brother's house. M.N.'s brother called the police. The police took M.N. to a hospital, where she was admitted and treated for multiple injuries. Due to the severity of her injuries, M.N. was transferred by ambulance to another hospital and treated for several days.

In December 2013, the state charged Garrison with five offenses: (1) first-degree criminal sexual conduct, *see* Minn. Stat. § 609.342, subd. 1(e)(i) (2012); (2) kidnapping, *see* Minn. Stat. § 609.25, subd. 1(2) (2012); (3) theft of a motor vehicle, *see* Minn. Stat. § 609.52, subd. 2(a)(17) (2012); (4) domestic assault by strangulation, *see* Minn.

Stat. § 609.2247, subd. 2 (2012); and (5) misdemeanor domestic assault, *see* Minn. Stat. § 609.2242, subd. 1(2) (2012).

The case went to trial in April 2014. At the outset of trial, the district court warned the parties, attorneys, and interested observers not to engage in nonverbal cues that might prejudice the jury, such as "hugging or coddling." But on the second day of trial, immediately after M.N. finished her testimony, she hugged her father for five to ten seconds in the back of the courtroom. The district court promptly convened a bench conference with the attorneys. The district court noted that several of the jurors watched the hug and had visible reactions. Noting its earlier warning, the district court declared a mistrial.

The retrial began the following day. At the outset of the retrial, the district court addressed both decorum and security issues. Specifically, the district court reiterated its earlier warning that there be no prejudicial nonverbal cues. The district court also expressed concern about M.N.'s brother, who reportedly had been lingering outside the jail, yelling at Garrison and making obscene gestures through a window. In addition, the district court expressed its general concern about courtroom security and the bailiffs' ability to manage an emotionally charged trial, mentioning the possibility of procuring additional personnel to provide security.

In light of the district court's concerns, the prosecutor suggested that the district court may wish to keep the courtroom closed during trial. In response, defense counsel requested that the courtroom remain open, with additional security personnel. The district court expressly stated that the courtroom would remain open, with certain

3

procedures to manage access to the courtroom. Specifically, the district court stated that, during voir dire and the evidentiary phase of trial, the courtroom doors would be locked but that anyone could enter the courtroom by contacting a person in court administration, who would provide an escort and allow entry to the courtroom in a quiet manner. The district court also stated that, during closing arguments and the reading of jury instructions, the courtroom doors would be locked to prevent entry during those proceedings. Garrison did not object to these procedures after the district court articulated them.

The specific means by which the district court implemented its procedures are not described in detail in the record, in part because there was no objection after the procedures were articulated. The record indicates that a sign was posted on the outside of the locked courtroom door during voir dire and the presentation of evidence to inform members of the public how they could enter the courtroom. Immediately before closing arguments, the district court provided a reminder that the courtroom doors would be locked. The district court stated, "I don't want people coming in and out, so if there's anyone that wants to watch, get them in here before I start the instructions if they want to. . . . I don't want interruptions during the instructions or during the closing arguments. . . . Now, having said that, is there anyone else out there that wants to come in that wants to appear?" After the jury retired to deliberate, the district court stated, "The back door can be unlocked as far as I am concerned." Nothing in the record indicates that any person attempted to attend any part of the trial but was denied entry to the courtroom.

4

The jury found Garrison guilty on all counts. The district court imposed a sentence of 172 months of imprisonment. Garrison appeals.

**D E C I S I O N**

Garrison argues that the district court erred by imposing restrictions on access to the courtroom that violated his constitutional right to a public trial.

The Sixth Amendment to the United States Constitution provides, "In all criminal prosecutions the accused shall enjoy the right to a . . . public trial." U.S. Const. amend. VI; *see also* Minn. Const. art. I, § 6. "[T]he Sixth Amendment right to a public trial is for 'the benefit of the accused,' permitting the public to see that the defendant is 'fairly dealt with and not unjustly condemned.'" *State v. Silvernail*, 831 N.W.2d 594, 600 (Minn. 2013) (quoting *Waller v. Georgia*, 467 U.S. 39, 46, 104 S. Ct. 2210, 2215 (1984)). "In addition, 'a public trial encourages witnesses to come forward and discourages perjury.'" *State v. Brown*, 815 N.W.2d 609, 616 (Minn. 2012) (quoting *Waller*, 467 U.S. at 46, 104 S. Ct. at 2215). The constitutional right to a public trial applies during all phases of trial, including pre-trial suppression hearings and voir dire of prospective jurors. *Id.* at 617. "But 'the right to a public trial is not an absolute right.'" *State v. Taylor*, 869 N.W.2d 1, 10 (Minn. 2015) (quoting *State v. Fageroos*, 531 N.W.2d 199, 201 (Minn. 1995)). The closure of a courtroom may be justified if the "party seeking to close the hearing . . . advance[s] an overriding interest that is likely to be prejudiced, the closure [is] no broader than necessary to protect that interest, the trial court . . . consider[s] reasonable alternatives to closing the proceeding, and . . . make[s] findings adequate to support the

5

closure." *Fageroos*, 531 N.W.2d at 201 (quoting *Waller*, 467 U.S. at 48, 104 S. Ct. at 2216) (other quotations omitted).

Nonetheless, "'[n]ot all courtroom restrictions implicate a defendant's right to a public trial.'" *Taylor*, 869 N.W.2d at 11 (quoting *Brown*, 815 N.W.2d at 617) (alteration in original). Some restrictions on access to the courtroom are considered so insignificant that they do not amount to a "true closure" of the courtroom and, thus, do not require an analysis of the *Waller* factors to determine whether the restrictions are justified. *See id.* at 11-12. Accordingly, the threshold question is whether there was a "true closure" of the courtroom. *See id.* A court must consider several factors to determine whether a "true closure" occurred: (1) whether the courtroom was cleared of all spectators; (2) whether the trial remained open to the public and press; (3) whether there were periods where members of public were absent; and (4) whether the defendant, defendant's family or friends, or any witnesses were excluded. *Silvernail*, 831 N.W.2d at 601 (citing *State v. Lindsey*, 632 N.W.2d 652, 660-61 (Minn. 2001)). This court applies a *de novo* standard of review to the question whether a defendant's constitutional right to a public trial has been violated. *Brown*, 815 N.W.2d at 616.

Garrison challenges two different procedures that were in force at different times during trial proceedings. He first contends that the district court erred by locking the courtroom door and requiring members of the public to contact court administration to gain entry to the courtroom during voir dire and the evidentiary phase of trial. He next contends that the district court erred by locking the courtroom to prevent entry during

6

closing arguments and the reading of jury instructions. We will separately consider Garrison's challenge to each procedure.

## A.    Voir Dire and Evidentiary Phase

We first consider whether there was a "true closure" during voir dire and the evidentiary phase of trial. Garrison contends that the courtroom was closed at those times because the requirement that interested members of the public contact court administration likely deterred members of the public from seeking entry to the courtroom.

We are not aware of any caselaw concerning whether the particular procedure employed by the district court constitutes a closure of the courtroom. In the absence of such caselaw, we must apply the four *Lindsey* factors. *See Silvernail*, 831 N.W.2d at 601. First, there is no indication in the record that the courtroom ever was cleared of all spectators. Second, the record indicates that the trial remained open to the public and press, so long as a member of the public or press followed the procedure described on the sign that was posted on the outside of the courtroom door. Third, there is no indication in the record that members of the public ever were absent from the courtroom. And fourth, there is no indication in the record that Garrison's family or friends were excluded from the courtroom. *See Lindsey*, 632 N.W.2d at 660-61. These factors suggest that there was not a "true closure" and, thus, no need to apply the *Waller* test to determine whether a closure of the courtroom was justified.

A recent supreme court opinion supports the conclusion that there was no closure in this case. In *Taylor*, the supreme court considered whether a "true closure" occurred

7

when members of the public were required to show photographic identification before entering the courtroom. 869 N.W.2d at 10-12. In applying the *Lindsey* factors, the supreme court noted that there was no indication that "the public was unable to attend due to the identification requirement" or that "even a single individual . . . was actually excluded." *Id.* at 11-12. The supreme court concluded that the requirement of photographic identification did not constitute a true closure of the courtroom and, thus, did not implicate the defendant's right to a public trial. *Id.* at 12; *see also State v. Cross*, 771 N.W.2d 879, 881-83 (Minn. App. 2009) (concluding that requirements that persons show identification and be photographed before entering courtroom was not closure of courtroom). This case is analogous to *Taylor*. In each case, the district court adopted a procedure that imposed a condition on entry to the courtroom. *See Taylor*, 869 N.W.2d at 10. But in each case, the condition was not designed to prevent anyone from entering the courtroom and, as far as the record reveals, did not produce that result. *See id.* at 11-12. For those reasons, the supreme court concluded in *Taylor* that there was no closure of the courtroom, which meant that it was unnecessary to conduct a *Waller* analysis. *See id.* at 11-12. The same reasons lead to the same result in this case.

Thus, the district court's procedure during voir dire and the evidentiary phase of trial in this case (*i.e.*, locking the courtroom door but allowing persons to enter by contacting court administration) was not a closure of the courtroom that implicates Garrison's constitutional right to a public trial.

**B.** **Closing Arguments and Jury Instructions**

We next consider whether there was a "true closure" during closing arguments and the reading of jury instructions. Garrison contends that the courtroom was closed at those times because anyone wishing to enter the courtroom during those times was excluded.

The supreme court considered similar arguments in *Silvernail* and *Brown*. In *Silvernail*, the supreme court considered whether locking the courtroom door during closing arguments constituted a closure. 831 N.W.2d at 600. In *Brown*, the supreme court considered whether locking the courtroom door during the reading of jury instructions constituted a closure. 815 N.W.2d at 616. In each case, the supreme court examined the *Lindsey* factors and concluded that there was no "true closure." *Silvernail*, 831 N.W.2d at 601; *Brown*, 815 N.W.2d at 617-18. The supreme court reached those conclusions because no one was removed from the courtroom, because any person present in the courtroom was permitted to remain, and because there was no indication that any person was actually prevented from entering the courtroom. *Silvernail*, 831 N.W.2d at 601; *Brown*, 815 N.W.2d at 617-18.

The same essential facts are present in this case. The district court never removed anyone from the courtroom. The district court allowed all persons in the courtroom before closing arguments to remain in the courtroom (and even attempted to notify interested persons outside the courtroom before the doors were locked). There is no indication in the record that anyone was prevented from entering the courtroom. Because the facts of this case are practically identical to the facts of *Silvernail* and *Brown*, we reach the same conclusion that the supreme court reached in those cases.

9

Thus, in light of the undisputed facts of this case, the district court's locking of the courtroom doors during closing arguments and the reading of jury instructions was not a closure of the courtroom that implicates Garrison's constitutional right to a public trial.

In sum, the district court did not violate Garrison's constitutional right to a public trial.

**Affirmed.**