STATE OF MINNESOTA

IN SUPREME COURT

A14-0942

Hennepin County                                                         Lillehaug, J.
                                                                         Dissenting, Page, J.

State of Minnesota,

        Respondent,

vs.                                                             Filed:  August 26, 2015
                                                               Office of Appellate Courts
Kemen Lavatos Taylor, II,

        Appellant.

_____

Lori Swanson, Attorney General, Saint Paul, Minnesota; and

Michael O. Freeman, Hennepin County Attorney, Jean E. Burdorf, Assistant County
Attorney, Minneapolis, Minnesota, for respondent.

Kemen Lavatos Taylor, II, Stillwater, Minnesota, pro se.

_____

S Y L L A B U S

1.      The district court's requirement that members of the public display

photographic identification in order to attend appellant's trial did not constitute a partial

courtroom closure.

2.      Assuming without deciding that the district court's exclusion of certain

evidence supporting an alternative motive of accomplice witnesses was erroneous, the

error was harmless.

1

3.   Assuming without deciding that the district court's admission of gang expert testimony identifying appellant as a gang member was erroneous, the error was harmless.

4.   The district court's jury instructions on aiding and abetting liability were not plainly erroneous.

5.   The district court's failure to give a limiting instruction sua sponte regarding appellant's prior convictions was not plainly erroneous.

6.   The district court did not violate appellant's right to a speedy trial.

7.   The district court's admission into evidence of a handwritten note seized from appellant's jail cell was not erroneous.

8.   Appellant waived review of whether the admission into evidence of jail call recordings was erroneous, as the briefing was inadequate and there was no obviously prejudicial error.

9.   The cumulative effect of the two assumed errors did not deprive appellant of a fair trial.

Affirmed.

Considered and decided by the court without oral argument.

O P I N I O N

LILLEHAUG, Justice.

Kemen Lavatos Taylor, II, was convicted of one count of first-degree murder and two counts of attempted first-degree murder related to the shooting of three teenagers.

On direct appeal, he alleges eight errors committed by the trial court. We affirm the convictions.

I.

On October 4, 2012, a grand jury indicted Taylor on two counts of murder related to the shooting death of Rayjon Gomez: first-degree premeditated murder and first-degree murder while committing a drive-by shooting. Taylor was also indicted on attempted first-degree murder charges related to two victims who survived the shooting.

The State's theory of the case at trial was as follows. On the night of August 24, 2011, Taylor drove a group of individuals associated with the Young-N-Thuggin gang ("YNT") to a certain neighborhood (known as "the lows") in north Minneapolis in a blue van to look for an individual known as Skitz. Skitz was affiliated with a rival gang and had allegedly shot Taylor's younger brother. Taylor sought to retaliate against Skitz and other members of the rival gang. Besides Taylor, 25 years old at the time, the van's occupants included Derrick Catchings, Donquarius Copeland, M.L., T.B., and Taylor's younger brother, all teenagers. As they drove through the neighborhood, somebody in the van thought he saw Skitz. Taylor drove a little further and parked the van. Catchings and Copeland got out and fired shots at several people in an alley. The shots hit Gomez, age 13, who died at the scene, wounded D.T., and missed D.H. Skitz was not among the victims.

D.T. and D.H. testified that they had been riding bikes in the lows that night with Gomez. While they were in an alley, they heard shots come from behind them. Gomez exclaimed that he had been hit. D.T. was hit in the shoulder by one of the bullets.

3

Neither D.T. nor D.H. saw who fired the shots into the alley. Later that night, Skitz, who was D.T.'s cousin, told D.T. that the shooters were looking for Skitz because he had shot Taylor's brother.

Testifying as part of a plea agreement, Catchings acknowledged that he was a member of YNT and that he had killed Gomez. He testified that, on the afternoon of August 24, 2011, he was at a house known as the "Nest," where he hung out with T.B., M.L., and Copeland. At some point, the group got into a blue van, driven by Taylor. The van went to Taylor's house to pick up Taylor's younger brother, who associated with people from YNT. Taylor's brother got in the van, and the group talked about how he had been shot by Skitz, who affiliated with an "opposition" gang.[1] According to Catchings, Taylor suggested that the group go to the lows to look for Skitz, or if they could not find Skitz, to look for rival gang members. Catchings had a semi-automatic handgun with him, which he showed to the group, including Taylor.

Catchings testified that Taylor drove the van to the lows. As they drove through the lows, M.L. said that he saw Skitz. Taylor drove to the next block and parked. Catchings and Copeland got out to find Skitz. Catchings and Copeland approached an alley and saw people riding bikes, one of whom Catchings thought was Skitz. Catchings handed the gun to Copeland, who shot at the individual. Copeland handed the gun back to Catchings, who fired several more shots. Copeland and Catchings then returned to the van, and Copeland said that he thought he had shot Skitz. Taylor told the group "to keep

---

[1] Catchings testified that Gomez associated with the same rival gang.

4

[it] between the people in the van." Taylor drove the group back to the Nest, where everybody but Taylor and his brother got out. Catchings hid the gun in the Nest, but it was seized by police several days later during a raid.

Copeland also testified as part of a plea agreement, and his testimony generally mirrored that of Catchings. Copeland testified that the same group of four was hanging out at the Nest on August 24, 2011. Copeland was a member of YNT, and testified that Catchings and M.L. associated with YNT. According to Copeland, a significant amount of fighting between YNT and Skitz's gang had occurred that summer.

Copeland testified that Taylor, his cousin, picked the group up in his blue van and went to Taylor's house to pick up Taylor's brother. The group discussed how Skitz had shot Taylor's brother. Catchings suggested they go to the lows to shoot at members of the rival gang. Taylor responded: "If that's what you all want to do, then that's what you all gonna do," and drove the group to the lows. Upon arriving, Copeland noticed two individuals from the rival gang. M.L. also said he saw Skitz. Taylor parked the vehicle, Copeland and Catchings got out, and the two ran to an alley. Catchings stopped at the alley because he said he saw Gomez, with whom Catchings had a "beef." Catchings shot several times at Gomez and the other two victims. He then handed the gun to Copeland, who fired several more shots. Catchings and Copeland returned to the van, and Copeland told the group: "I think I shot somebody." Taylor replied "[y]ou all didn't pop nobody." Taylor then drove the group back to the Nest and dropped off Copeland, Catchings, M.L., and T.B.

5

Both Copeland and Catchings acknowledged that they did not initially implicate Taylor when talking with police. Catchings did not implicate Taylor because he "didn't want to bring nobody else in it." Copeland was concerned about getting the others in trouble, and believed that only the shooters should get in trouble. Copeland and Catchings agreed to testify against Taylor when they negotiated guilty pleas to second-degree murder.

T.B. also testified for the State, but he was a hostile witness. At the time of trial, T.B. had not been charged with a crime for his participation in the Gomez shooting, and he was not testifying as part of a plea agreement. His version of events generally echoed the testimony of Copeland and Catchings: M.L., T.B., Copeland, and Catchings were hanging out at the Nest. Copeland and Catchings were members of YNT. Taylor picked them up in a van, and eventually drove them to pick up his younger brother. The group talked about how Skitz shot Taylor's brother. Taylor then drove to the lows, where T.B. saw a rival gang member; Taylor drove a little further and parked. Copeland and Catchings jumped out of the van with a gun. T.B. heard some shots; Copeland and Catchings got back in the van, and one of them exclaimed: "I think I got . . . Rayjon!" As the group drove away, Copeland and Catchings joked about what had just happened. Taylor reportedly told them to "[s]top talkin' about it, be about it."

The other two alleged members of the group in the van, M.L. and Taylor's brother, did not testify at trial. The record does not explain why.

Three jailhouse informants testified. The first jailhouse informant, M.P., testified that he and Taylor shared a cell during November 2012. Taylor told M.P. that he was the

6

driver of the vehicle used in the murder of Gomez, and that the group had been looking to retaliate against Skitz. Taylor told M.P. that, before Catchings and Copeland got out of the van to shoot, they advised Taylor's brother that: "We gonna get down for ya, we gonna lay somebody down. We're gonna kill somebody." After the shooting, Taylor told those in the van: "Be quiet, don't say nothin' if we caught." Generally, M.P. displayed considerable knowledge about the specific facts of the crime, testifying about the gun used and the neighborhood.

The second jailhouse informant, H.P., agreed to testify as part of a plea agreement for an unrelated offense. At trial, he changed his story and claimed that Taylor had not told him anything about the case. A police investigator later testified that H.P. told him that he was "extremely afraid to testify [that day] in court," and was worried that when he went back to prison "he would be attacked."

The third jailhouse informant, C.R., testified that he had known Taylor for around 10 years and that Taylor was affiliated with YNT. Taylor told C.R. that he was driving a group to look for members of Skitz's gang to shoot in retaliation for the shooting of somebody that Taylor knew. According to C.R., he decided to testify against Taylor because he was upset that Taylor would use his influence over "juveniles" to have them commit crimes: "He could have prevented it, but he put them in that situation to do what

they did." Taylor apparently could coerce the "juveniles" to be the shooters, because he was a "big homey," or their superior.[2]

The district court also admitted two phone calls made by Taylor while in jail. In the first phone call, Taylor called an individual and expressed regret for not posting bail: "That's why I should've bailed out, man. If I would've bailed out, I'da been on the run right now." The individual responded: "They would've came and tried to pick your ass up for that charge." Then Taylor said: "But I would've been gone."

In the second phone call, Taylor called his girlfriend and discussed having her call his attorneys. His girlfriend asked: "Alright, and, and I'm just, I was wit' you that day all that shit happened." Taylor responded: "Tell 'em yea, any questions they have, tell you (inaudible)." Taylor's girlfriend was not called as a witness by either side.

Taylor took the stand in his defense. He denied that he was in a gang or clique. He also denied any involvement in the shooting of Gomez. He acknowledged that he had previously been convicted of two unrelated felonies: fifth-degree possession of narcotics and possession of a firearm. At the time of the trial, he was in prison for the latter offense.

On rebuttal, the State called a gang expert from the Minneapolis Police Department. The expert examined two photographs that had been previously admitted without objection. In the first, Taylor appeared to be displaying a YNT symbol. In the

---

[2] C.R. also testified that Taylor asked him for advice on whether Taylor should fabricate an alibi by having his mother testify that the van was broken at the time of the murder.

8

second, Taylor appeared to be displaying a sign of disrespect to Skitz's gang. In the opinion of the expert, relying on those photographs, and on other undescribed information gathered from social media, police reports, jail calls, and school resource officers, Taylor was a gang member.

The jury found Taylor guilty of all counts. He was convicted of one count of first-degree murder and two counts of first-degree attempted murder.

On direct appeal, Taylor alleges eight errors committed by the district court: (1) it excluded from the courtroom members of the public that did not have photographic identification; (2) it excluded evidence supporting an alternative motive of the eyewitnesses; (3) it admitted testimony from a gang expert identifying Taylor as a gang member; (4) it gave jury instructions on aiding and abetting liability that did not include certain elements; (5) it did not sua sponte instruct the jury that appellant's prior convictions could only be used for impeachment purposes; (6) it violated his right to a speedy trial; (7) it admitted a note protected by attorney-client privilege; and (8) it admitted prison phone call recordings. We consider each alleged error in turn.

II.

We first consider Taylor's argument that the district court's photographic identification requirement violated his right to a public trial. To prevent disruptions by persons in the gallery, the district court issued a list of "basic rules" for spectators at trial. Besides prohibiting profanity, threatening gestures, gum chewing, and cell phones, the court required spectators to show photographic identification before being allowed entry into the courtroom. Taylor did not object. The record does not show whether the

9

identification requirement was enforced and, if so, whether anyone who sought to enter the courtroom could not.

Taylor argues that the district court's identification requirement violated his right to a public trial. "Whether the right to a public trial has been violated is a constitutional issue that we review de novo." *State v. Brown*, 815 N.W.2d 609, 616 (Minn. 2012).

Both the U.S. and the Minnesota Constitutions provide that "[i]n all criminal prosecutions the accused shall enjoy the right to a . . . public trial." U.S. Const. amend. VI; Minn. Const. art. I, § 6. The public trial right is " 'for the benefit of the accused; that the public may see he is fairly dealt with and not unjustly condemned, and that the presence of interested spectators may keep his triers keenly alive to a sense of their responsibility and to the importance of their functions.' " *State v. Lindsey*, 632 N.W.2d 652, 660 (Minn. 2001) (quoting *Waller v. Georgia*, 467 U.S. 39, 46 (1984)). But "the right to a public trial is not an absolute right." *State v. Fageroos*, 531 N.W.2d 199, 201 (Minn. 1995). In some situations, a courtroom closure may be justified. To determine whether a closure is justified, we have adopted the U.S. Supreme Court's *Waller* test, which provides:

> "[T]he party seeking to close the hearing must advance an overriding interest that is likely to be prejudiced, the closure must be no broader than necessary to protect that interest, the trial court must consider reasonable alternatives to closing the proceeding, and it must make findings adequate to support the closure."

*Fageroos*, 531 N.W.2d at 201 (quoting *Waller*, 467 U.S. at 48).

Taylor does not argue that the photographic identification requirement constituted a full closure of the courtroom, but rather that it constituted a partial closure. For both

full and partial closures, we apply the *Waller* test. *State v. Mahkuk*, 736 N.W.2d 675, 685 (Minn. 2007).

We have considered partial closures in two cases. In *Mahkuk*, the district court allowed police officers to exclude the defendant's brother and a cousin from the courtroom. 736 N.W.2d at 684-85. We held that the district court failed to make findings adequate to support its closure decision. *Id.* at 685. In *Fageroos*, the district court closed the courtroom to all spectators during the testimony of two minor victims of sexual assault.[3] 531 N.W.2d at 200-01. Similar to *Mahkuk*, we held that the district court failed to articulate its findings supporting the need for closure with sufficient specificity and detail. *Fageroos*, 531 N.W.2d at 202.

But before we can apply the *Waller* test to determine if a closure is justified, we must determine whether a closure even occurred. After all, "[n]ot all courtroom restrictions implicate a defendant's right to a public trial." *Brown*, 815 N.W.2d at 617. In *Brown*, the district court locked the courtroom doors during jury instructions. *Id.* However, the courtroom was never cleared of all spectators, those in attendance were told they were welcome to stay, no individual was ever ordered removed, and the jury instructions "did not comprise a proportionately large portion of the trial proceedings." *Id.* at 618. We held that, for those reasons, the district court's conduct "did not implicate Brown's right to a public trial." *Id.*

---

[3] Although at the time we did not describe the action as a partial closure, we characterized it as such in *Mahkuk*, 736 N.W.2d at 685.

11

To reach that holding in *Brown*, we relied on our previous decision in *State v. Lindsey*, in which we characterized the trial court's decision to exclude underage spectators as "not a true closure, in the sense of excluding all or even a significant portion of the public from the trial." 632 N.W.2d 652, 660 (Minn. 2001). In *Lindsey*, we considered whether a closure "was too trivial to amount to a violation of the [Sixth] Amendment." *Id*. at 660-61 (quoting *Peterson v. Williams*, 85 F.3d 39, 42 (2d Cir. 1996)); *see also State v. Silvernail*, 831 N.W.2d 594, 600-01 (Minn. 2013) (applying *Lindsey*'s "triviality" standard and holding that the locking of courtroom doors during the State's closing argument was not a closure). We identified several factors to consider when determining whether a "true closure" occurred: whether "all or even a significant portion of the public" was excluded; whether the defendant, his family, his friends, or any witnesses were excluded; and whether any individuals actually excluded were known to the defendant. *Lindsey*, 632 N.W.2d at 660-61.

Here, Taylor argues that a partial closure occurred because "there are members of the public who do not have photo identification and could not attend [Taylor's] trial." But the district court's identification restriction is more analogous to *Lindsey*, in which the restriction was too trivial to constitute a true closure, than to the partial closures in *Mahkuk* or *Fageroos*. As in *Lindsey*, here there is no evidence in the record that a significant portion of the public was unable to attend due to the identification requirement; that Taylor, his family, his friends, or any witnesses were excluded; or that any individuals actually excluded were known to Taylor. Further, unlike in *Lindsey*, in which two unidentified minors were actually excluded, here there is simply no evidence

12

that the requirement was enforced, or, if so, that even a single individual—identifiable or not—was actually excluded. Thus, we hold that the photographic identification requirement did not constitute a "true" closure.

Although we have no constitutional ground for reversal,[4] we caution district courts that they should not require those who wish to attend a public trial to produce identification as a condition of entry to the courtroom, unless there is good cause and no reasonable alternative under the *Waller* test.[5] We do not want anyone to be discouraged from attending or viewing proceedings in Minnesota courts.[6]

III.

We next consider Taylor's argument that the district court committed reversible error when it excluded certain evidence related to a possible alternative motive of the eyewitnesses. To cast doubt on whether he was involved in the shooting, Taylor sought to counter the State's claim that he and the others had the same motive to kill by showing that the shooters had a motive that did not involve Taylor. He wanted to do this by

---

[4] By this decision, we do not "uphold" the trial court's photo identification order, as the dissent suggests. Rather, we hold that the record simply does not support reversal. The dissent's charge that the court is on a "march" to limit public access is inaccurate.

[5] In *Crawford v. Marion County Election Board*, 553 U.S. 181, 199 (2008), the U.S. Supreme Court took judicial notice that the elderly, those with economic or personal limitations, the homeless, and those with religious objections to being photographed are less likely to have government-issued photo identification.

[6] "One of our solemn obligations is to ensure Minnesota's courts remain open and accessible to all. Upholding this commitment is a central mission of our Judicial Branch, and it guides our every step . . . ." Chief Justice Lorie S. Gildea, Speech to Minnesota State Bar Association (June 26, 2014).

13

asking Copeland and Catchings about previous gang-related incidents. The district court excluded the evidence under Rule 403, reasoning that "the fact that other people also had a motive that was either the same or different doesn't negate the fact that Mr. Taylor had a motive. . . . I don't think the fact that other people may have had different motives is probative for anybody's case, and it certainly has the possibility of confusing the issues in the case."

On appeal, Taylor argues that the exclusion of evidence was erroneous under two theories: his right to introduce evidence in his defense and his right to confront witnesses. Such alleged constitutional error is subject to harmless-error review. *See State v. Blom*, 682 N.W.2d 578, 622 (Minn. 2004) (applying harmless-error review to an "erroneous exclusion of evidence that violates the defendant's right to present evidence"); *State v. Pride*, 528 N.W.2d 862, 867 (Minn. 1995) (applying harmless-error review to "Confrontation Clause errors").

A.

Assuming without deciding that the district court erred in excluding the evidence, and applying the harmless-error test to the exclusion, we "must be satisfied beyond a reasonable doubt that an average jury (i.e., a reasonable jury) would have reached the same verdict 'if the evidence had been admitted and the damaging potential of the evidence fully realized.' " *State v. Greer*, 635 N.W.2d 82, 90 (Minn. 2001) (quoting *State v. Post*, 512 N.W.2d 99, 102 (Minn. 1994)).

We are satisfied beyond a reasonable doubt that a reasonable jury would have reached the same verdict even if Taylor had been able to present evidence that Copeland

14

and Catchings had been involved in specific, prior gang-related incidents. This is because the district court's assumed error did not preclude Taylor from exploring Copeland's and Catchings' gang-related motives; it only precluded evidence of particular previous acts. Indeed, some evidence of alternative gang-related motives of the shooters was admitted at trial. Catchings testified that, while Skitz was the target, the group drove around to look for members of the "opposition," suggesting that Skitz's gang affiliation (as well as Taylor's brother's gang affiliation) was related to the retaliation. T.B. testified that the van was pursuing a member of the rival gang who was not Skitz. Copeland testified that Catchings "had a beef" with Gomez, and that Catchings both recognized and intentionally targeted Gomez. T.B. further testified that one of the shooters, on reentering the van, said "I think I got [Gomez]," suggesting that Gomez, a member of the opposition gang, was the target.

Thus, Taylor had and used evidence that the shooters were not primarily or solely motivated by the shooting of Taylor's brother.[7]  Evidence of other incidents would not

---

[7]  For instance, in opening, Taylor's trial counsel argued that:

> [T]he evidence is going to show that this was actually about Rayjon Gomez, the person who was killed, that he was the target of the shooting all along, and he was the target of the shooting because Derrick Catchings had a problem with him, that it went back a little ways. They had a beef. You are going to hear testimony about that, but this had nothing to do with [Taylor's brother], it was never about [him], that this was about a problem with Derrick Catchings and Rayjon Gomez and that that was in fact the motivation for the shooting.

Further, in closing, Taylor's trial counsel characterized Copeland and Catchings as gang members with a motive to shoot Gomez: "They are hanging out at the Nest, they are

(Footnote continued on next page.)

have added much. Therefore, the district court's error, if any, under the "right to present evidence" theory, was harmless.

B.

Applying the harmless-error test to an assumed violation of the Confrontation Clause, we must determine "whether, assuming that the damaging potential of the cross-examination were fully realized, a reviewing court might nonetheless say that the error was harmless beyond a reasonable doubt." *Pride*, 528 N.W.2d at 867 (quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 684 (1986)). To do so, we look to a variety of factors, including: the importance of the testimony to the prosecution; whether the testimony was cumulative; the presence or absence of evidence corroborating or contradicting the testimony on material points; the extent of cross-examination otherwise permitted; and the overall strength of the prosecution's case. *Pride*, 528 N.W.2d at 867 (quoting *Van Arsdall*, 475 U.S. at 684).

Here, any assumed Confrontation Clause error was harmless beyond a reasonable doubt. It is true that the testimony of Copeland and Catchings was critically important to the State's case. But not only was their testimony on material points corroborated by each other's testimony, it was corroborated by the testimony of T.B. and jailhouse informants. T.B.'s corroborating eyewitness testimony was particularly significant, as it was not induced by a plea deal. Further, although Taylor was not allowed to impeach

---

(Footnote continued from previous page.)
scouting the opposition, they are looking for the opposition, they are doing drills, they are active in the streets, they are making a name for themselves."

16

Copeland and Catchings regarding several specific prior incidents, he was able to extensively impeach them based on their trial testimony, their plea agreements, their criminal history, and the inconsistent stories they told to police. And, as we indicated previously, even in light of the district court's ruling, Taylor was able to elicit a considerable amount of testimony on alternative motives. Thus, the district court's error, if any, under the Confrontation Clause was harmless.

IV.

We next consider Taylor's argument that the district court committed reversible error when it allowed a gang expert to testify that Taylor was a member of a gang.

We have "never categorically prohibited the use of gang expert testimony." *State v. Jackson*, 714 N.W.2d 681, 691 (Minn. 2006). But we have cautioned that "district courts should exercise caution in admitting gang-expert testimony because of the potential for such experts to unduly influence the jury." *State v. Blanche*, 696 N.W.2d 351, 374 (Minn. 2005). To be admissible, "gang expert testimony 'must add precision or depth to the jury's ability to reach conclusions about matters that are not within its experience.' " *Jackson*, 714 N.W.2d at 691 (quoting *State v. DeShay*, 669 N.W.2d 878, 888 (Minn. 2003)).

We will assume without deciding that the district court erred in admitting expert testimony that Taylor was a member of a gang. We then determine whether the assumed error was harmless. An error is harmless if there is no reasonable possibility that it "substantially influence[d] the jury's decision." *DeShay*, 669 N.W.2d at 888.

17

Here, there is no reasonable possibility the gang expert's opinion substantially influenced the jury's decision. The expert's testimony was cumulative to other admitted evidence that suggested, if not established, that Taylor was either a member of, or clearly associated with, YNT. *See DeShay*, 669 N.W.2d at 888 (holding that there was no reasonable possibility that gang-expert testimony substantially influenced the guilty verdict because the testimony was "for the most part, duplicative of testimony given by witnesses with first-hand knowledge of the relevant events and which established that [the defendant] was a member of, and involved with, a group that operated as a criminal gang"); *see also State v. Lopez-Rios*, 669 N.W.2d 603, 613 (Minn. 2003). Without objection from Taylor, the district court admitted two photographs of Taylor flashing hand symbols. The police officer (not the gang expert) who authenticated the evidence testified, without objection, that one picture depicted YNT's gang symbol and the other depicted a symbol of disrespect to Skitz's gang. C.R., one of the jailhouse informants, testified that Taylor was affiliated with YNT, and was a "big homey" to the shooters. Finally, Catchings testified that not only did Taylor drive a group of YNT members and associates to the lows to look for the "opposition," but that Taylor actually suggested that they go to the lows to look for Skitz, or if they could not find Skitz, to look for rival gang members.

Therefore, any reasonable juror would have concluded, even absent the gang expert's testimony, that Taylor was either a member of, or associated with, YNT. The gang expert's testimony was cumulative and harmless.

V.

We next consider Taylor's argument that the district court improperly instructed the jury on accomplice liability. While district courts have broad discretion to formulate appropriate jury instructions, a district court abuses its discretion if the jury instructions "confuse, mislead, or materially misstate the law." *State v. Kelley*, 855 N.W.2d 269, 274 (Minn. 2014). To determine if a jury instruction correctly states the law, we analyze the criminal statute and the case law under it. *See State v. Kuhnau*, 622 N.W.2d 552, 556 (Minn. 2001). Where there is a conflict between the Minnesota Jury Instructions Guide, Criminal (CRIMJIG) and the statute or our case law, the latter two control. *See State v. Koppi*, 798 N.W.2d 358, 364 (Minn. 2011).

Because Taylor did not object to the jury instructions, we review for plain error. *Kelley*, 855 N.W.2d at 273; *see also State v. Earl*, 702 N.W.2d 711, 720 (Minn. 2005) ("Failure to object to jury instructions generally results in a waiver of the issue on appeal."). Under the plain-error doctrine, Taylor must show that there was: "(1) an error; (2) that is plain; and (3) the error must affect substantial rights." *Kelley*, 855 N.W.2d at 273-74. Even if Taylor "satisfies the first three prongs of the plain-error doctrine, we may correct the error only if it 'seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings.' " *Id.* at 274 (quoting *State v. Crowsbreast*, 629 N.W.2d 433, 437 (Minn. 2001)).

A.

The district court instructed the jury that "a defendant may be found guilty of a crime even though somebody else actually commits the criminal acts, provided the

19

defendant intentionally aided, advised, hired, counseled, conspired with, or otherwise procured the other person or persons to commit the crime." This was largely a recitation of the accomplice liability statute, captioned "Liability for Crimes of Another." The statute provides that "[a] person is criminally liable for a crime committed by another if the person intentionally aids, advises, hires, counsels, or conspires with or otherwise procures the other to commit the crime." Minn. Stat. § 609.05, subd. 1 (2014). The district court further instructed the jury:

> Mere presence at the scene of a crime, without more, is not enough for you to impose liability under the aiding and abetting law. Such a person is merely a witness. However, a person's presence does constitute aiding and abetting if it is done knowing that a crime will be or is being committed and intending that it further the commission of the crime.

The two elements in the district court's instruction regarding a defendant's presence—knowledge and intent—come from our case law and CRIMJIG 4.01. However, the current version of CRIMJIG 4.01, published in 2014 after Taylor's trial, adds a third element: that the defendant's presence "*did aid* the commission of the crime." 10 Minn. Dist. Judges Ass'n, *Minnesota Practice—Jury Instruction Guides, Criminal*, CRIMJIG 4.01 (5th ed. 2014) (emphasis added). Taylor argues that the lack of the third element in the district court's instruction was error.

It is unclear why CRIMJIG 4.01 adopted this third element that requires the State to prove the efficacy of a defendant's presence. In *State v. Mahkuk*, we identified two elements for determining whether a defendant's presence "intentionally aids" another in committing a crime: (1) the defendant knew that the "alleged accomplices were going to commit a crime"; and (2) the defendant "intended his presence or actions to further the

20

commission of that crime." 736 N.W.2d 675, 682 (Minn. 2007). We said nothing about whether the State must prove beyond a reasonable doubt that the defendant's presence actually "did aid" the commission of the crime. *See id.* We reiterated those same "important and necessary principles" in *State v. Milton*, 821 N.W.2d 789, 805-06 (Minn. 2012). In that case, we similarly did not include whether the defendant "did aid" the commission of the crime as an element. *See id.*

To support his argument that aiding and abetting necessarily includes an efficacy element, Taylor cites *State v. Parker*, 282 Minn. 343, 356, 164 N.W.2d 633, 641 (1969) ("Certainly mere presence on the part of each would be enough if it is intended to *and does aid* the primary actors." (emphasis added)). But *Parker* cannot be read as requiring the State to prove beyond a reasonable doubt that a defendant's presence was effective in aiding the primary actor. Rather, *Parker* acknowledges that efficacy is probative for the jury to consider in deciding whether a defendant "intentionally aids" another: whether he knew about the crime and intended for his presence to further its commission.

We made clear in *Mahkuk* and *Milton* the elements required to prove accomplice liability under Minn. Stat. § 609.05, subd. 1. We decline to add an efficacy element. Thus, the district court did not err.

B.

The district court also instructed the jury on "expansive liability," as it is labeled in the accomplice-liability statute. *See* Minn. Stat. § 609.05, subd. 2 (2014). The expansive liability subdivision states that "[a] person liable [for aiding and abetting] is also liable for any other crime committed in pursuance of the intended crime if

21

reasonably foreseeable *by the person* as a probable consequence of committing or attempting to commit the crime intended." Minn. Stat. § 609.05, subd. 2 (emphasis added). Here, the district court instructed the jury that "[t]he law further provides that a defendant who intentionally aids and abets another person in the commission of a crime is not only guilty of the intended crime, but also of any other crime which was a reasonably foreseeable and probable consequence of trying to commit the intended crime." While the statute requires that the other crimes committed in pursuance of the intended crime be reasonably foreseeable *by Taylor*, the district court's instruction did not specify that.

We have both "suggest[ed]" and "urge[d]" district courts to use the statutory language of "reasonably foreseeable to the person" when instructing jurors on expansive liability. *See State v. Earl*, 702 N.W.2d 711, 722 (Minn. 2005); *State v. Vang*, 774 N.W.2d 566, 582 (Minn. 2009). But we have never held that a failure to do so automatically constitutes reversible plain error. *See Vang*, 774 N.W.2d at 582 ("[W]e do not conclude that failure to do so automatically constitutes plain error that affects a defendant's substantial rights."); *State v. Yang*, 774 N.W.2d 539, 558 n.6 (Minn. 2009) ("But the failure to include such language does not require automatic reversal, particularly when the record clearly indicates that it was reasonably foreseeable to appellant that if he aided and abetted [gang] members in shooting at the [rival gang members], some of the [rival gang members] would be injured or killed."). In fact, we have previously held that a jury instruction omitting such language was not plainly

22

erroneous, as it "did not serve to confuse or mislead the jury and did not materially misstate the law." *State v. White*, 684 N.W.2d 500, 509 (Minn. 2004).

Even were we to assume that the district court's instruction was plainly erroneous, we would look to the record to determine whether the jury would have understood the reasonable foreseeability requirement. *See Vang*, 774 N.W.2d at 582; *Yang*, 774 N.W.2d at 558 n.6. Here, the jury would have understood the reasonable foreseeability to be from Taylor's perspective. In closing, the State emphasized Taylor's knowledge and motive: he wanted to "kill Skitz or kill somebody who is associated with Skitz, anybody in [the rival gang]" and he "knew that [Catchings] had a [gun] with him. He had seen the gun." In other words, Taylor was "literally and figuratively the driving force behind this murder. . . . [I]t was put in motion when the defendant put his foot on the gas pedal, put his hands on the steering wheel, and drove the teenagers down to the lows for one purpose—to look for Skitz or any other enemy." The jury could not have understood the "reasonable foreseeability" of the murder to be from someone else's perspective; the State emphasized that Taylor premeditated and intended for Copeland and Catchings to kill "Skitz or any other enemy." Thus, the district court's instruction did not affect any of Taylor's substantial rights.

C.

Also regarding expansive liability, Taylor argues that the district court should have specifically instructed the jury on the original intended crime. The expansive liability subdivision provides that "[a] person liable [for aiding and abetting] is also liable for any other crime committed in pursuance of *the intended crime* if reasonably foreseeable by

23

the person as a probable consequence of committing or attempting to commit the crime intended." Minn. Stat. § 609.05, subd. 2 (emphasis added).

Taylor cites several cases in which we identified the specific intended crime. *See State v. Atkins*, 543 N.W.2d 642, 646-47 (Minn. 1996); *State v. Russell*, 503 N.W.2d 110, 114 (Minn. 1993); *State v. Merrill*, 428 N.W.2d 361, 369 (Minn. 1988). But none of these cases can be fairly read to require the district court to specify for the jury the original intended crime. Rather, we merely outlined the elements of an offense, adapted to the particular facts of the case. We have, on at least three occasions, upheld jury instructions that did not specify the original intended crime. *See Earl*, 702 N.W.2d at 722 n.1; *White*, 684 N.W.2d at 509; *State v. Peirce*, 364 N.W.2d 801, 809 (Minn. 1985). Thus, the district court did not commit plain error.

Even were we to assume that the district court committed plain error, it could not have affected a substantial right. The State and its witnesses made very clear that the original intended crime was to shoot Skitz or another member of "the opposition." There was no room for the jury to misapply expansive liability to some other intended crime.

VI.

We next consider Taylor's argument that the district court committed reversible error when it allowed the State to impeach him with two prior felony convictions without

24

a limiting instruction. Because Taylor did not request such an instruction, he must show plain error.[8]

Taylor's prior convictions were admitted under Rule 609, which provides that evidence of a defendant's prior convictions, either punishable by more than 1 year of imprisonment or involving dishonesty or a false statement, may be admissible, subject to some limitations. The rule specifies that the evidence may be used "[f]or the purpose of attacking the credibility of a witness." Minn. R. Evid. 609(a).

Taylor cites only *State v. Bissell* to support his argument that the lack of a limiting instruction about how to use prior convictions is plain error. In that case, the district court refused, over the defendant's request, to caution the jury to use the defendant's prior convictions solely for determining credibility. *State v. Bissell*, 368 N.W.2d 281, 283 (Minn. 1985). *Bissell* is distinguishable. In the current case, Taylor made no such request.

It is true that, in *Bissell*, we analogized evidence of prior convictions to *Spreigl* evidence and stated that "the trial court, on its own, should give a limiting instruction both when the evidence is admitted and as part of the final instructions to the jury." *Bissell*, 368 N.W.2d at 283 (citing *State v. Forsman*, 260 N.W.2d 160, 169 (Minn. 1977)). In the case cited for that proposition, *Forsman*, we stated that, for *Spreigl* evidence, trial courts "should, sua sponte, give an unequivocal limiting instruction both at

---

[8] The record does not reflect whether Taylor's decision not to ask for the instruction was, as is sometimes the case, trial strategy. *See State v. Goodloe*, 718 N.W.2d 413, 424 (Minn. 2006).

25

the time the evidence is admitted and at the close of trial." *Forsman*, 260 N.W.2d at 169. But, in *Forsman*, we ultimately held that, "in the absence of a request, [the district court's] failure to do so was not reversible error." *Id.* We have consistently held the same in other cases regarding *Spreigl* evidence. *See State v. Vick*, 632 N.W.2d 676, 685 (Minn. 2001) ("[W]hile trial courts are advised, even absent a request, to give a cautionary instruction upon the receipt of other-crimes evidence, failure to do so is not ordinarily reversible error."); *State v. Williams*, 593 N.W.2d 227, 237 (Minn. 1999) ("While a trial court should generally still provide [limiting] instructions *sua sponte* to ensure that the 404(b) evidence is not used for an improper purpose, the failure to provide limiting instructions absent a request is not reversible error."); *State v. Wahlberg*, 296 N.W.2d 408, 420 (Minn. 1980) ("It would have been better, in the instant case, had the trial court given a limiting instruction sua sponte [regarding prior bad acts], but its failure to do so is not reversible error where, as here, defense counsel did not request one."). Because *Bissell* and analogous *Spreigl* cases do not require a limiting instruction to be given sua sponte, the district court did not err, much less plainly err.

Further, the lack of an instruction here was not prejudicial, nor did it affect the outcome of the case. *See State v. MacLennan*, 702 N.W.2d 219, 236 (Minn. 2005) ("In order to show that the [plain] error has affected his substantial rights, the defendant must show that the error was prejudicial and that it affected the outcome of the case."). Like the defendant, every eyewitness and jailhouse witness had a criminal record. Taylor cross-examined each witness extensively using criminal history, challenging the witnesses' credibility by using words like "con," "trickster," and "criminal."

26

In a trial full of such witnesses, the State never suggested that criminal history should be used for any purpose other than determining Taylor's credibility as a witness. *See Bissell*, 368 N.W.2d at 283. When the State used Taylor's prior convictions in closing, it was only for impeachment: "[T]aylor didn't want you to believe some of the State's witnesses because they are criminals. Well, the defendant testified, and he's a criminal. What [opposing counsel] said to you is that criminals are inherently unreliable. Well you know what? Then that makes the defendant's testimony inherently unreliable."

Finally, although the district court did not deliver the limiting instruction provided in CRIMJIG 2.02, it did provide analogous instructions at other points during the trial. In instructing the jury on evaluating the "testimony and credibility of the witnesses," the district court told the jury that it "should and may take note of," among other things, "[w]hether the witness has been convicted of a crime, especially one involving dishonesty or [a] false statement." While not as strong an instruction as CRIMJIG 2.02, it conveyed to the jury that prior convictions should be used for impeachment. And when the State impeached Taylor using other prior bad conduct, such as giving a false name to a police officer, the district court instructed the jury:

> [T]he defendant is not on trial for any conduct that occurred on dates other than August 24th, 2011. Thus, you may not convict him solely on the basis of conduct occurring on other dates. Similarly, you may not use such evidence to conclude that the defendant has a particular character trait or that he acted in conformity with such trait. And finally, you may not use such evidence to conclude that the defendant is a person who deserves to be punished. To do so would be unfair.

This instruction is similar to CRIMJIG 2.01, the *Spreigl* instruction. Thus, failing to give the limiting instruction sua sponte did not affect a substantial right.

27

VII.

We next consider Taylor's pro se argument[9] that he was deprived of his right to a speedy trial. Criminal defendants have the right to a speedy trial under the constitutions of both the United States and Minnesota. U.S. Const. amend. VI; Minn. Const. art. I, § 6. Claimed Sixth Amendment violations are subject to de novo review. *State v. Brown*, 815 N.W.2d 609, 616 (Minn. 2012).

A.

We have adopted the test articulated by the U.S. Supreme Court in *Barker v. Wingo* for speedy trial challenges. *See State v. Widell*, 258 N.W.2d 795, 796 (Minn. 1977) (citing *Barker v. Wingo*, 407 U.S. 514 (1972)). Under the *Barker* test, we must consider: "(1) the length of the delay; (2) the reason for the delay; (3) whether the defendant asserted his or her right to a speedy trial; and (4) whether the delay prejudiced the defendant." *State v. Windish*, 590 N.W.2d 311, 315 (Minn. 1999) (citing *Barker*, 407 U.S. at 530-33). None of these factors is "either a necessary or sufficient condition to the finding of a deprivation of the right of speedy trial. Rather, they are related factors and must be considered together with such other circumstances as may be relevant." *Barker*, 407 U.S. at 533. In other words, we must "engage in a difficult and sensitive balancing process." *Id*.

---

[9] Taylor's former appellate counsel made and briefed the arguments previously discussed. Taylor, who filed a pro se supplemental brief that raised additional issues, terminated this representation 8 days before the case was submitted to the court.

On the first prong, the delay from the date of indictment, *see State v. Jones*, 392 N.W.2d 224, 235 (Minn. 1986), to the first day of trial was 1 year and 4 months. Further, the trial did not begin until over 100 days after Taylor's speedy trial demand. A delay that exceeds 60 days from the date of the demand raises a presumption that a violation has occurred, and we must apply the remaining factors of the test. *See Windish*, 590 N.W.2d at 315-16; *see also* Minn. R. Crim. P. 11.09.

On the second prong, the key question is "whether the government or the criminal defendant is more to blame for th[e] delay." *Vermont v. Brillon*, 556 U.S. 81, 90 (2009) (quoting *Doggett v. United States*, 505 U.S. 647, 651 (1992)). But "different weights should be assigned to different reasons." *Barker*, 407 U.S. at 531. For instance, a "[d]eliberate delay 'to hamper the defense' weighs heavily against the prosecution," while " 'neutral reason[s] such as negligence or overcrowded courts' weigh less heavily." *Brillon*, 556 U.S. at 90 (quoting *Barker*, 407 U.S. at 531). "When the overall delay in bringing a case to trial is the result of the defendant's actions, there is no speedy trial violation." *State v. DeRosier*, 695 N.W.2d 97, 109 (Minn. 2005).

Only one delay was fairly attributable to the State: the unavailability of a State's witness. This was before Taylor requested a speedy trial, and the delay was for good cause. The only delay after Taylor requested a speedy trial was to resolve a conflict of interest between Taylor's counsel and his codefendant's counsel. This was not attributable to the State, and was also for good cause. Because both continuances were for good cause, this factor weighs against a speedy trial violation.

On the third prong, Taylor asserted his right to a speedy trial over 100 days before trial. This weighs in Taylor's favor.

On the fourth and final prong, again adopting the analysis of *Barker*, we have identified three interests to consider in determining whether a defendant suffered prejudice: "(1) preventing oppressive pretrial incarceration; (2) minimizing the anxiety and concern of the accused; and (3) preventing the possibility that the defense will be impaired." *Windish*, 590 N.W.2d at 318 (citing *Barker*, 407 U.S. at 532). We have noted that the third interest, preventing "impairment of a defendant's defense, is the most serious." *Id.* (citing *Doggett v. United States*, 505 U.S. 647, 655 (1992)).

If a defendant is already in custody for another offense, as Taylor was here, the first two interests are not implicated. *Id.* The only remaining question is whether the defense was likely harmed by the delay. *See id.* ("A defendant does not have to affirmatively prove prejudice; rather, prejudice may be suggested by likely harm to a defendant's case."). In other words, Taylor has to suggest "evidentiary prejudice." *Doggett*, 505 U.S. at 657.

Typically, such prejudice is suggested by memory loss by witnesses or witness unavailability. *See Barker*, 407 U.S. at 531; *State v. Jones*, 392 N.W.2d 224, 235-36 (Minn. 1986). In this case, Taylor's novel argument is that he was prejudiced because the delay gave the State the opportunity to secure plea agreements with his codefendants.

We reject the notion that the procurement of a plea agreement constitutes unfair prejudice. *See United States v. Abad*, 514 F.3d 271, 275 (2d Cir. 2008) ("[The defendant] contends that the delay allowed the government to locate certain 'key prosecution

30

witnesses' . . . . But this is not the sort of prejudice contemplated by *Barker*'s fourth factor. That prejudice is concerned with impediments to the ability of the defense to make its own case . . .; the opportunity for the prosecution to prepare for trial does not, on its own, amount to prejudice to the defense."). Notably, there is no allegation that the delay was manufactured by the State. *See State v. Anderson*, 275 N.W.2d 554, 555 (Minn. 1978) (concluding there was no speedy trial violation in part because the defendant did not show "that there was any attempt by the state to unfairly delay the prosecution in order to gain a tactical advantage"). Thus, this factor weighs against a speedy trial violation.

Based on the four factors as balanced, Taylor's speedy trial rights were not violated. The delay was not greatly excessive, the continuances were either not objected to or were for good cause, and Taylor identifies no unfair prejudice.

B.

In the alternative, Taylor argues that his trial counsel's failure to move for dismissal on speedy trial grounds constitutes ineffective assistance. We disagree.

To satisfy a claim of ineffective assistance of counsel, "(1) the defendant must prove that counsel's representation fell below an objective standard of reasonableness; and (2) the defendant must prove there was a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different." *State v. Nicks*, 831 N.W.2d 493, 504 (Minn. 2013) (citing *Strickland v. Washington*, 466 U.S. 668, 687-96 (1984)). Even assuming that Taylor's trial counsel's performance fell below an objective standard of reasonableness in failing to move for a dismissal for lack of a

speedy trial, it is highly unlikely that the result of the proceeding would have been different. The delays were for good cause, Taylor was already incarcerated on a different conviction, and Taylor has not identified any unfair prejudice.

VIII.

We next consider Taylor's pro se argument that the district court erred when it admitted into evidence a note seized from his jail cell in which he described T.B. as a "lying snitch ass." Taylor argues that the note was protected by attorney-client privilege.

The constitutions of both the United States and Minnesota "guarantee a right of legal representation to anyone charged with a crime." *State v. Willis*, 559 N.W.2d 693, 697 (Minn. 1997) (citing U.S. Const. amend. VI; Minn. Const. art. I, § 6). However, the attorney-client privilege, provided by Minn. Stat. § 595.02, subd. 1(b) (2014), is not a constitutional right. *State v. Andersen*, 784 N.W.2d 320, 333 (Minn. 2010). We have declined to articulate a standard by which a defendant can "prevail on a claim that an intrusion into the attorney-client relationship amounted to a violation of the right to counsel." *Id*. at 334. We need not announce such a standard in this case, as the jail cell note was not protected by attorney-client privilege.

The attorney-client privilege protects from disclosure "communications that seek to elicit legal advice from an attorney acting in that capacity, that relate to that purpose, and that are made in confidence by the client . . . unless the privilege is waived." *Nat'l Texture Corp. v. Hymes*, 282 N.W.2d 890, 895 (Minn. 1979). "The existence of the [attorney-client] privilege is a question of fact which must be proved by the one asserting it." *Sprader v. Mueller*, 265 Minn. 111, 117, 121 N.W.2d 176, 180 (1963). We give

32

"great deference to the district court's findings of fact and will not set them aside unless clearly erroneous," which requires a "definite and firm conviction that a mistake occurred." *Andersen*, 784 N.W.2d at 334.

The district court found that the note did not communicate anything to defense counsel regarding the case. In other words, the note did not seek to elicit legal advice from defense counsel. Deferring to the district court's finding, and given the language used in the note, it is likely that Taylor made the note for himself to express frustration or anger, not for his counsel in order to secure legal advice. Further, the district court had the benefit of reviewing the entirety of the seized materials in camera and excluded those that Taylor intended to communicate to his attorney. The district court's factual finding on the jail cell note was not clearly erroneous.

IX.

We next consider Taylor's pro se argument that the district court abused its discretion when it admitted a jail call recording. Due to an error by Taylor, that section of his brief, if any, is missing. It is therefore unclear about which recording Taylor complains.

We deem arguments waived on appeal if a pro se supplemental brief "contains no argument or citation to legal authority in support of the allegations." *State v. Krosch*, 642 N.W.2d 713, 719 (Minn. 2002). However, if a "prejudicial error is obvious on mere inspection," we may consider the allegation. *Louden v. Louden*, 221 Minn. 338, 339, 22 N.W.2d 164, 166 (1946). On mere inspection, no error is obvious in the admission of the two phone calls Taylor made from jail.

33

The first call—in which Taylor said that he wished he had posted bail in order to be "on the run"—was admitted to show consciousness of guilt. We have held that a "[f]light before apprehension" may be considered by the jury as "suggestive of a consciousness of guilt." *State v. McTague*, 190 Minn. 449, 453, 252 N.W. 446, 448 (1934). Although Taylor's statements in the phone call merely expressed a desire to flee and did not constitute actual flight or an attempted escape, they were suggestive of a consciousness of guilt. *See Straight v. State*, 397 So. 2d 903, 908 (Fla. 1981) ("When a suspected person in any matter attempts to escape or evade a threatened prosecution by flight, concealment, resistance to lawful arrest, *or other indications after the fact of a desire to evade prosecution*, such fact is admissible, being relevant to the consciousness of guilt which may be inferred from such circumstance." (emphasis added)). Thus, the admission of the first call recording does not appear to be a prejudicial error.

In the second call, Taylor asked his girlfriend to call his lawyers to tell them that she was with him on the day of the murder. The phone call was relevant to both Taylor's credibility and his consciousness of guilt, as it suggested an attempt to manufacture a false alibi. Thus, the admission of the call was not error.

X.

Finally, Taylor argues that even if each trial error was individually harmless, the cumulative effect of the errors deprived him of a fair trial. We have assumed two errors without deciding: admitting gang expert testimony and precluding certain evidence of the shooters' involvement in previous gang-related incidents.

34

Taylor would be entitled to a new trial if those errors, "when taken cumulatively, had the effect of denying [him] a fair trial." *State v. Keeton*, 589 N.W.2d 85, 91 (Minn. 1998). But we cannot say that, absent the complained-of errors, the jury would have reached a different verdict. *See State v. Jackson*, 714 N.W.2d 681, 698 (Minn. 2006). This is not a "very close factual case." *State v. Underwood*, 281 N.W.2d 337, 340 (Minn. 1979); *see also State v. Erickson*, 610 N.W.2d 335, 340-41 (Minn. 2000) ("Unlike *Underwood*, the facts in the instant case are not close. The evidence against appellant was very strong, and included two confessions and his accomplice's testimony."). Here, the State presented the detailed testimony of two convicted accomplices and another eyewitness that placed Taylor as the driver of the van with the motive and intent to aid and abet a shooting. Those witnesses corroborated each other on material points, and were further corroborated by the detailed testimony of two jailhouse informants. Further, Taylor's own words—in the jail cell note and in two recorded phone calls—were suggestive of guilt. In light of the strength of the State's case, the value of further evidence of the alternative motive of the shooters (when it had already been established) and the harm of the cumulative gang expert testimony (when Taylor's gang affiliation had already been established) was so minimal that it could not have affected the jury's verdict. The cumulative effect did not deprive Taylor of a fair trial.

For the foregoing reasons, we affirm Taylor's first-degree murder and attempted first-degree murder convictions.

Affirmed.

PAGE, Justice (dissenting).

I respectfully dissent from that part of the court's decision upholding[1] the trial court's requirement that members of the public provide photo identification in order to attend Taylor's trial. In *State v. Brown*, we authorized trial courts to lock courtroom doors during the time when the jury is being instructed. 815 N.W.2d 609, 617-18 (Minn. 2012). We extended our approval of locking the courtroom doors to closing arguments in *State v. Silvernail*, 831 N.W.2d 594, 600-01 (Minn. 2013). Today we take another step in our march to limit the public's access to our courtrooms. While I fully acknowledge my role in authoring the court's decisions in both *Brown* and *Silvernail*, requiring members of the public to provide photo identification to enter a courtroom during trial is a bridge too far.[2] The dissent in *State v. Silvernail*, 831 N.W.2d 594, 607-09 (Minn. 2013)

---

[1] The court asserts that it is not upholding the trial court's photo identification order. But, when the court states: "[W]e have no constitutional ground for reversal," it is, in fact, saying that the trial court's photo identification order was not erroneous. Thus, the court *is* upholding the trial court's order. Otherwise, the court would not be saying that there is "no constitutional ground for reversal" because any error would be structural error requiring reversal. *See State v. Bobo*, 770 N.W.2d 129, 139 (Minn. 2009) (explaining that denial of a defendant's right to a public trial constitutes structural error); *State v. Brown*, 732 N.W.2d 625, 630 (Minn. 2007) ("Structural errors require automatic reversal because such errors 'call into question the very accuracy and reliability of the trial process.' " (quoting *State v. Osborne*, 715 N.W.2d 436, 447 n.8 (Minn. 2006))).

[2] In the same way that requiring voters to present photo identification in order to receive a ballot for an election has the potential to create an unconstitutional burden on the right to vote, *see Veasey v. Abbott*, ____ F.3d ____, 2015 WL 4645642 at *17 (5th Cir. Aug. 5, 2015) (holding that the voter-identification statute at issue had an impermissible discriminatory effect on Hispanics and African-Americans), requiring the

(Footnote continued on next page.)

(Anderson, Paul H., J., dissenting), referred to the "recent phenomenon [of] 'creeping courtroom closure.' " The trial court's actions here and today's decision leads me to conclude that the *Silvernail* dissent got it right. It is time to revisit our holdings in *Brown* and *Silvernail*.

Although we permitted the courtroom closures in *Brown* and *Silvernail*, we cautioned trial courts that "the act of locking courtroom doors . . . creates the appearance that Minnesota's courtrooms are closed or inaccessible to the public." *Brown*, 815 N.W.2d at 618; *see also Silvernail*, 831 N.W.2d at 601 n.2. We further noted that "[t]rial courts should therefore commit such acts carefully and sparingly" and that "[t]o facilitate appellate review in future cases . . . the better practice is for the trial court to expressly state on the record why the court is locking the courtroom doors." *Brown*, 815 N.W.2d at 618; *see also Silvernail*, 831 N.W.2d at 601 n.2. Our cautionary statement has not been followed, as evidenced by the fact that we have denied nine petitions for review since *Brown* that have challenged a trial court's decision to close or lock the courtroom doors at various stages of the trial.[3]

---

(Footnote continued from previous page.)
public to present photo identification in order to enter a courtroom during trial has the potential to unconstitutionally burden a defendant's right to a public trial.

[3]    *See State v. Hicks*, 837 N.W.2d 51 (Minn. App. 2013), *rev. denied on courtroom closure* (Minn. Nov. 13, 2013); *State v. Mosby*, A12-0988, 2013 WL 2923486 (Minn. App. June 17, 2013), *rev. denied* (Minn. Sept. 17, 2013); *State v. Trautman*, No. A12-0929, 2013 WL 2301796 (Minn. App. May 28, 2013), *rev. denied* (Minn. Aug. 6, 2013); *State v. Richmond*, No. A12-0899, 2013 WL 1942995 (Minn. App. May 13, 2013), *rev. denied* (Minn. July 16, 2013); *State v. Perez-Martinez*, No. A11-2003, 2012 WL 5476112 (Minn. App. Nov. 13, 2012), *rev. denied* (Minn. Jan. 29, 2013); *State v. Juma,* No. A11-

(Footnote continued on next page.)

I, like the court, am "extremely reluctant to overrule our precedent," and I understand that we require a "compelling reason" to do so. *State v. Lee*, 706 N.W.2d 491, 494 (Minn. 2005). It is clear to me now, however, that the practice of closing courtrooms to the public has creeped "its way into the routine of many of Minnesota's criminal courts." *Silvernail*, 831 N.W.2d at 609 (Anderson, Paul H., J., dissenting). The breadth and scope of the closures that are occurring compel me to conclude that it is time to stop the creep.[4]

For these reasons, I respectfully dissent.

---

(Footnote continued from previous page.)
2142, 2012 WL 4856158 (Minn. App. Oct. 15, 2012), *rev. denied on courtroom closure,* (Minn. Jan. 15, 2013); *State v. Irby*, 820 N.W.2d 30 (Minn. App. 2012), *rev. denied on courtroom closure* (Minn. Nov. 20, 2012); *State v. Cook*, No. A11-1332, 2012 WL 3263760 (Minn. App. Aug. 13, 2012), *rev. denied* (Minn. Oct. 24, 2012); *State v. Thomas*, No. A11-1215, 2012 WL 3023335 (Minn. App. July 23, 2012), *rev. denied* (Minn. Oct. 16, 2012).

[4] The irony is not lost on me that, on one hand, the court is quick to permit trial courts to lock the courtroom doors or otherwise deny access to courtrooms to individual citizens; while on the other hand, the court is in haste to expand the use of video cameras in those same courtrooms in the name of public access and education, without regard to the harm that the expanded camera coverage may cause. *See Promulgation of Amendments to the Minn. Gen. Rules of Prac.*, No. ADM09-8009, Mem. at 1-2 (Minn. filed Aug. 12, 2015) (Page, J., dissenting).